**UNITED STATES v. KEEGAN et al.**

No. 112–336.

District Court, S. D. New York.

May 13, 1947.

624

Anthony J. Armore, of West New York, N. J., and Francis D. Murphy, of New York City, for petitioner.

John F. X. McGohey, U. S. Atty., Louis Bender, and Bruno Schachner, Ass't U. S. Attys., all of New York City, for the United States.

BARKSDALE, District Judge Designate.

The question here presented arises on the petition of Wilbur V. Keegan for a certificate of innocence under the provisions of 18 U.S.C.A. §§ 729 and 730, and the objections thereto of the United States, said Code sections being as follows:

"§ 729. Erroneous conviction; authorization of suit against United States

"Any person who, having been convicted of any crime or offense against the United States and having been sentenced to imprisonment and having served all or any part of his sentence, shall hereafter, on appeal or on a new trial or rehearing, be found not guilty of the crime of which he was convicted or shall hereafter receive a pardon on the ground of innocence, if it shall appear that such person did not commit any of the acts with which he was charged or that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the United States or the District of Columbia, in which the offense or acts are alleged to have been committed, and that he has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction, may, subject to the limitations and conditions hereinafter stated, and in accordance with the provisions of the Judicial Code, maintain suit against the United States in the Court of Claims for damages sustained by him as a result of such conviction and imprisonment. May 24, 1938, c. 266, § 1, 52 Stat. 438."

"§ 730. Same; certificate of innocence; admissibility; contents

"The only evidence admissible on the issue of innocence of the plaintiff shall be a certificate of the court in which such person was adjudged not guilty or a pardon or certified copy of a pardon, and such certificate of the court, pardon, or certified copy of a pardon shall contain recitals or findings that—

"(a) Claimant did not commit any of the acts with which he was charged; or

"(b) that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the United States or the District of Columbia, in which the offense or acts are alleged to have been committed; and

"(c) that he has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction. May 24, 1938, c. 266, § 2, 52 Stat. 438."

On July 7, 1942, petitioner and divers others were indicted under the provisions of 50 U.S.C.A.Appendix, § 311, Section 11 of the Selective Training & Service Act of 1940, for conspiring "to counsel divers persons to evade, resist and refuse service in the land and naval forces of the United States * * *". It was charged that the petitioner was counsel for, and his codefendants were national officers, department leaders and unit leaders of, the German-American Bund. All these defendants, except three who had pleaded guilty, came on for trial before the undersigned, sitting by assignment in the District Court for the Southern District of New York, on September 17, 1942, which trial resulted in the conviction of defendant and 23 of his codefendants, one defendant being acquitted. Promptly after conviction, the petitioner and his 23 codefendants were sentenced to imprisonment. Thereupon petitioner and his codefendants who had been sentenced, began serving their sentences. Upon appeal to the Circuit Court of Appeals for the Second Circuit, these convictions and sentences were unanimously affirmed. Keegan v. United States, 141 F. 2d 248. The Supreme Court granted certiorari, and on June 11, 1945, the judgment of conviction of all defendants by the Dis-

trict Court was reversed by the Supreme Court and the cause was remanded thereto for further proceedings in conformity with the opinion of the Supreme Court. Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (four Justices dissenting). The ground of reversal, as stated in the headnote, was: "The evidence in this case was insufficient to sustain conviction of the petitioners, * * *".

Upon receipt of the mandate, the District Court entered an order making the mandate of the Supreme Court the judgment of the District Court, dismissing the indictment, and discharging the defendants from custody. Meanwhile, the petitioner had served a very substantial portion of his sentence of imprisonment.

Being advised that under these circumstances he was entitled to maintain his suit in the Court of Claims for damages as provided in Section 729, he filed his petition in the District Court for a certificate of innocence as provided in Section 730. Honorable John C. Knox, Senior District Judge of the Southern District of New York, being of the opinion that this petition should be considered by the judge before whom the trial was had, the petition has been referred to the undersigned. The Government objects to the granting of such certificate upon the grounds:

(I) That the record of trial shows that, even though he has been found not guilty of conspiracy in consequence of the mandate of the Supreme Court, the record of trial shows that he was nevertheless guilty of the substantive offense of counseling evasion of the military service;

(II) That petitioner was guilty of wilful misconduct which contributed to bring about his arrest and conviction; and

(III) That petitioner was guilty of conspiracy to induce others to make false statements and to furnish false information under the Alien Registration Act, 8 U.S.C.A. §§ 137, 155, 156a, 451–460, 18 U.S.C.A. §§ 9–13, as charged in a separate indictment from that upon which he was tried, and as to which indictment a nolle prosequi was entered after the decision of the Supreme Court reversing his conviction under the other indictment.

Oral argument has been heard, and briefs have been filed.

### Legislative History of the Act.

 It has always been recognized that the safe-guarding of society by the prosecution of crimes against it, is a sovereign attribute inherent in all governments, one of the jura majestatis, and for mistakes in exercising this sovereign right, there can be no liability against the government without its consent. It has been said that it would be injurious to the public interest if a government hesitated to prosecute a suspected guilty person for fear of striking an innocent one. Nevertheless, it cannot be gainsaid that, where a sovereign government has punished a person for a crime of which the person was entirely innocent, in fairness and justice the injured person should be compensated. He cannot be made whole. The wrong cannot be wholly righted, but in such instances, at the very least, the injured person can be compensated by the sovereign. Of course, it is distasteful to the public generally, and lawyers and judges particularly, to think that an entirely innocent person is ever punished for a crime. There are, however, certain glaring instances of this tragedy. There is the case of Lesurques, in France, just before the Revolution—a victim of mistaken identity—which is chronicled in nearly every book on circumstantial evidence. Then there is the English case of Adolf Beck, who was convicted and imprisoned for seven years for the crime of another man. Beck had no legal redress available, but his case was so shocking that he was granted a gratuity of 5,000 pounds by Parliament. In America, there is the case of Andrew Toth, who, after having been convicted of murder in Pennsylvania, and serving 20 years, was found to have been absolutely innocent. He had no redress at law, and the Legislature declining to provide compensation, Andrew Carnegie gave him a pension of $40 a month. This case was the subject of an editorial in the Virginia Law Register in September, 1911—17 Va.Law Reg. 406—which is in part as follows:

"Had this man been imprisoned at the instance of a private person for twenty-four hours in jail and such imprisonment been shown to be false and malicious he would have recovered ample damages. But in his present situation he is without redress and the strong arm of the law which has taken out of his life twenty years, caused him to endure shame, suffering and humiliation, is withdrawn from him and he goes forth an outcast and a beggar, only saved from actual want by private charity. Is this a condition of affairs which should exist in a civilized country, boasting of men's equality before the law? In a late number of the Register we spoke of the propriety of a law allowing a man tried for an offence against the Commonwealth and acquitted, an allowance for costs. We believe such a law should be passed, despite the fact that there is no precedent in history for it.

"But in a case like Toth's it seems to us there can be no question that the State should compensate the man and that a general act should be passed permitting a man who has suffered at the hands of the law for a crime of which he was innocent, compensation to be fixed by a court of justice upon good cause shown."

The recent case of Bertram Campbell in New York, is another tragic instance of miscarriage of justice. Campbell v. State, 186 Misc. 586, 62 N.Y.S.2d 638.

The principle that private property cannot be taken for public use, without just compensation, is not only inherent in the Constitution, but is a principle of great antiquity. It is thoroughly illogical that in a legal system an innocent person may be deprived of his liberty, which is much dearer to him than property, by his sovereign, without compensation, although he cannot be so deprived of his property. However, there seems to have been no legislation by our Government on this subject until the enactment of the statutes here under consideration, in 1938. The earliest instance of an attempt in this Country to procure the enactment of such legislation of which I am aware, was in 1912, when a bill was introduced in Congress providing for the indemnification of innocent persons convicted of crime. This bill seems to have been drafted by, and introduced largely at the instance of, Prof. Edwin M.

Borchard, then Law Librarian of Congress, and to accompany the bill, an article was printed entitled "State Indemnity for Errors of Criminal Justice", by Prof. Borchard, with an editorial preface by Prof. John H. Wigmore. This article and its preface are intensely interesting, both from a philosophical and historical viewpoint. From this article, it appears that the movement for the indemnification by the state of erroneously convicted persons, was begun toward the end of the Eighteenth Century in France, one of its most earnest champions being Voltaire, "the friend of the oppressed". Prof. Borchard says:

"It was probably due to the intimate correspondence between Voltaire and Frederick the Great that we find in Prussia in 1766 the first legislative expression of the obligation of the State to indemnify unjustly arrested and detained persons. This decree provided:

" 'If a person suspected of crime has been detained for trial, and where, for lack of proof, he has been released from custody, and in the course of time his complete innocence is established, he shall have not only complete costs restored to him, but also a sum of money as just indemnity, according to all the circumstances of the case, payable from the funds of the trial court, so that the innocent person may be compensated for the injuries he suffered.' "

It appears that the effective life of this decree was not long. In any event, it is not found in the Prussian Code of Criminal Procedure of December 11, 1805. However, the seeds of this idea germinated, and by the time of the publication of Prof. Borchard's article, he states that statutes, in various forms, providing for the indemnification by the state of innocent persons unjustly punished, were in effect in Spain, Portugal, Sweden, Norway, Denmark, Austria, France, Hungary, Germany, and Mexico. Speaking of the European statutes, Prof. Borchard said: "It will be seen that they have endeavored to restrict the indemnity to those only who are clearly shown to deserve it. Therefore, first, the class that has the right to receive the indemnity is strictly defined; secondly, to exclude the undeserving, special and general limitations on the right are established from various points of view, such as censurable conduct of the claimant; thirdly, the injury indemnified is in general confined to the pecuniary loss only; fourthly, a very brief statute of limitations is provided; and, lastly, the indemnity is in other respects restricted so that the burden on the State treasury will not be oppressive."

Although the Bill which was introduced in the Senate in 1912, heretofore referred to (and which I will hereafter refer to as the "Borchard Bill"), failed of enactment, the two Code Sections here under consideration contain so much of the identical language of the original Borchard Bill, I am satisfied that the Borchard Bill was the forerunner of the present statute, and that a consideration of the Borchard Bill, and his explanation of its provisions, should be of great value. Therefore, from Senate Document No. 974, 63rd Congress, 3rd Session, p. 31, I quote as follows the Bill and Prof. Borchard's comments on the various sections thereof:

"A Bill to grant relief to persons erroneously convicted in courts of the United States.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who, having been convicted of any crime or offense against the United States, shall hereafter, on appeal from the judgment of conviction or on the retrial or rehearing of his case, be found to have been innocent of the crime with which he was charged and not guilty of any other offense against the United States, or who, after inquiry by the Executive has received a pardon on the ground of innocence, may, under the conditions hereinafter mentioned, apply by petition for indemnification for the pecuniary injury he has sustained through his erroneous conviction and imprisonment.

"The bill is limited to convictions in the Federal courts—that is, crimes or offenses against the United States. It is limited to those only who have been *convicted and imprisoned* under a judgment of conviction, and whose innocence is subsequently established. The right to relief is discretionary only. It is called here indemnification,

although some other word may be substituted. The relief is limited to the *pecuniary* injury, thus excluding all compensation for *moral* injury, which in case of conviction for crime is generally the more serious element of injury. This limitation follows in general the European statutes, and has as its object the restriction to its narrowest limits (while acknowledging the principle) of a demand on the State treasury. When the Innocence is established after the wrongful conviction *plus* imprisonment, the indemnity should cover the injury during the whole period of detention, both before and after trial. The expression 'of the crime with which he was charged *and not guilty of any other offense against the United States*' has been used to cover cases where the indictment may fail on the original count, but claimant may yet be guilty of another or a minor offense. Therefore, if the accused has committed *any* offense against the United States, his right to relief is barred. Some may raise the objection that the right to petition the United States is granted in the bill, even though the accused may have a private right of action against an individual for false imprisonment or malicious prosecution. I do not consider it desirable to insert this limitation in the bill, though if there is a general feeling that the accused must exhaust all his other remedies, either as a bar to this relief or as a condition precedent to demanding it, words to this effect will have to be inserted. My own feeling is that the Court of Claims should take into consideration, under section 9, all matters connected with the case, including the other remedies of the accused, whether he had a possible right of action against third persons, how much that right may have been worth, the possibility of securing and executing judgment and particularly the extent of the *State's* participation in the wrong inflicted on the individual.

"Sec. 2. That the claimant may, within six months after he has been finally acquitted or pardoned on the ground of innocence, petition the Court of Claims for the relief granted in this Act.

"A *very short statute of limitations is* fixed, following the European statutes in this respect. The claim is to be brought before the Court of Claims, which has been granted jurisdiction over similar awards made by the United States to individual claimants. (See, for example, the French spoliations act, 23 Stat. L., 283.)

"Sec. 3. That the court is hereby authorized to make all needful rules and regulations, consistent with the law, for executing the provisions hereof.

"This follows in general the provisions of section 2 of the French spoliations act (23 Stat. L. 283).

"Sec. 4. That the claimant shall have the burden of proving his innocence, in that he must show that the act with which he was charged was not committed at all, or, if committed, was not committed by the accused.

"The cases in which the relief can be claimed are limited here to those only in which the claimant shall affirmatively prove his innocence. Hence only a most flagrant case of injustice could be brought within the terms of this section. In providing that the claimant must show that the crime was not committed at all, or, if committed, was not committed by the accused, I am following in general the provisions of the law of Sweden and Hungary. It is likewise intended to limit the relief to cases in which the justice of an award is obvious.

"Sec. 5. That the claimant must show that he has not, by his acts or failure to act, either intentionally or by willful misconduct or negligence, contributed to bring about his arrest or conviction.

"This carries out simply the equitable maxim that no one shall profit by his own wrong or come into court with unclean hands. It follows the provisions generally found in the European statutes, although these provide, for example in the German act, that gross negligence must exist to bar the right. In the United States we are opposed to fixing degrees of negligence. (See 18 Harvard Law Review, 536, 537.)

"Sec. 6. That the Court of Claims shall examine the validity and amount of all claims included within the description of this Act; they shall receive all suitable testimony on oath or affirmation and all other proper evidence; and they shall report all such conclusions of fact and law

as in their judgment may affect the right to relief.

"In its general provisions this section follows section 3 of the French spoliations act (23 Stat. L. 283). Under it the Court of Claims would, of course, receive the record from the trial court, the appellate court, and the second trial court, in order to determine the justice of relief in the case. They may also call for oral or written testimony whenever desired. This section gives the court full power and opportunity to arrive at the facts.

"Sec. 7. That upon proof satisfactory to the Court of Claims that the claimant is unable to advance the costs of court and of process, the cost of obtaining and printing the record of the original proceedings and of securing the attendance of such witnesses as the chief justice or the presiding judge of the Court of Claims shall certify to be necessary, and the service of all notices required by this Act, shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims, on presentation to the Secretary of the Treasury of a duly authenticated order, certified by the clerk of the Court of Claims and signed by the chief justice or, in his absence, by the presiding judge of said court.

"The claimant will in most cases be a poor person and it is desirable that the expense of bringing up the record should not fall as a burden on him. This expense might, in fact, prevent the poor claimant from bringing suit at all. It should, therefore, be provided that in such cases where the chief justice, or the presiding judge of the Court of Claims, considers that the claimant has made out a prima facie case of erroneous conviction and his own innocence that the expense of bringing up the record shall be borne by the Treasury. Where the claimant does not make out a prima facie case coming within the provisions of this Act, the chief justice of the Court of Claims would not make the certification necessary to have the Treasury bear the expense.

"Sec. 8. That the court shall cause notice of all petitions presented under this Act to be served on the Attorney General of the United States, who shall be authorized, by himself or his assistant, to examine witnesses, to cause testimony to be taken, to have access to all testimony taken under this Act, and to be heard by the court. He shall resist all claims presented under this Act by all proper legal defenses.

"The purpose of this section is self-explanatory. In terminology it follows the provisions of section 4 of the French spoliations act (23 Stat. L. 284).

"Sec. 9. That the Court of Claims in granting or refusing the relief demanded shall take into consideration all the circumstances of the case which may defeat or in any other way affect the right to and the amount of the relief herein provided for, but in no case shall the relief granted exceed $5,000.

"The granting of the relief is *discretionary*, as was stated in the beginning. Most of the European statutes generally present a list of conditions which shall bar or limit the right to the relief, but I consider it best to follow the French law, which makes no mention of limiting conditions, but leaves the judge to determine from all the circumstances of the case whether any and how much relief is proper. The relief is limited to $5,000. This provision is to limit any exorbitant claims which may be brought.

"The Court of Claims is given jurisdiction over the matter in preference to the trial court, or the appellate court, or the second trial court (which presumably could judge better of the merits and circumstances of the case) in order to maintain the traditions of American judicial procedure. If the jury or trial court were given the right to pronounce on the propriety of an award in a case of acquittal (as is the case in some of the European countries), it would bring into our law a new kind of acquittal, in which the jury or judge could acquit *with degrees of approval or sympathy*. The distinction would be an odious one to make. While it would be desirable to have the benefit of the special knowledge of the case secured by the trial court or the jury, still it is better to forego this advantage for the sake of conformity with legal custom and leave the establishment of the damage

to a new court conforming in its jurisdiction in this case to its jurisdiction in similar cases of claims against the United States.

"In all respects (a) as to the person indemnified, (b) as to what he must show, (c) as to the amount of the indemnity, and (d) as to the discretionary character of the relief, the indemnity has been limited to the most flagrant cases of unjust conviction and deserving relief.

"Sec. 10. That in all cases of final judgments by the Court of Claims the sum due thereby shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims on presentation to the Secretary of the Treasury of a copy of said judgment, certified by the clerk of the Court of Claims, and signed by the chief justice, or, in his absence, by the presiding judge of said court."

I do not know whether the Borchard Bill was reintroduced in the 64th, or any subsequent, Congress prior to the 75th Congress. However, it does appear that the Borchard Bill was reintroduced in the 75th Congress as Senate Bill 750, and, after very substantial change and amendment, was enacted into law as the statute here under consideration. The report, in full, of the Senate Judiciary Committee, which is quite informative, is as follows:

(Report No. 202, 75th Congress, 1st Session):

"The Committee on the Judiciary, to whom was referred the bill (S.750) to grant relief to persons erroneously convicted in the courts of the United States, after consideration thereof, report the bill favorably to the Senate with the recommendation that it be passed.

"Memorandum

"The purpose of this bill is to grant relief to any person who has been erroneously convicted in a Federal court of a crime or offense against the United States and who shall thereafter be found not guilty of the crime with which he was charged and not guilty of any other offense against the United States.

"The principle underlying this measure has been applied in some extent in most European countries, but in the United States no attempt has been made to indemnify the victims who suffer by reason of mistakes in the criminal law. Certain amendments to the bill have been made pursuant to the suggestions submitted by the Attorney General, whose letter is hereinafter set forth in full. With these changes in the bill, it has the approval of the Department of Justice. Attention is called to the following excerpt from an editorial by John H. Wigmore, dean, Northwestern University School of Law:

"The state is apt to be indifferent and heartless when its own wrongdoings and blunders are to be redressed. The reason lies partly in the difficulties of providing proper machinery, and partly in the principle that individual sacrifices must often be borne for the public good. Nevertheless, one glaring instance of such heartlessness, not excusable on any grounds, is the state's failure to make compensation to those who have been erroneously condemned for crime.

"There is plenty of analogy for such a measure. The Federal Court of Claims is a standing example of the general maxim that the state should fulfill its obligations and redress its wrongs by judicial inquiry and award. And a particular analogy here is found in the constitutional principle that compensation should be made for property taken for public purposes. To deprive a man of liberty, put him to heavy expense in defending himself, and to cut off his power to earn a living, perhaps also to exact a money fine—these are sacrifices which the state imposes on him for the public purpose of punishing crime. And when it is found that he incurred these sacrifices through no demerit of his own, that he was innocent, then should not the state at least compensate him so far as money can do so?

"Why has the principle never been here applied? Because we have persisted in the self-deceiving assumption that only guilty persons are convicted. We have been ashamed to put into our code of justice any law which per se admits that our justice may err. But let us be realists. Let us confess that of course it may and does err occasionally. And when the occasion

is plainly seen, let us complete our justice by awarding compensation. This measure must appeal to all our instincts of manhood as the only honorable course, the least that we can do. To ignore such a claim is to make shameful an error which before was pardonable.

"Prof. Edwin M. Borchard has made extensive studies in this field and has written largely upon the subject. The following statement is an excerpt from Senate Document No. 974, Sixty-second Congress, third session, entitled 'State Indemnity for Errors of Criminal Justice,' by Edwin M. Borchard:

"In an age when social justice is the watchword of legislative reform, it is strange that society, at least in this country, utterly disregards the plight of the innocent victim of unjust conviction or detention in criminal cases. No attempt whatever seems to have been made in the United States to indemnify these unfortunate victims of mistakes in the administration of the criminal law, although cases of shocking injustice are of not infrequent occurrence. The case of Andrew Toth, who was convicted of murder in Pennsylvania, sentenced to life imprisonment, and after having served 20 years was found to have been absolutely innocent, is still fresh in the public mind. There was no provision of law for relieving his terrible condition, the State legislature declined to make compensation, and only through the generosity of Andrew Carnegie, who pensioned him at $40 a month, was the man able to return to Hungary, his native land. In England, the flagrant injustice meted out to Adolf Beck, who, through the most lax administration of the criminal law, was convicted for the crime of another man and was imprisoned for 7 years, resulted at least in the establishment of the court of criminal appeal (7 Edw. VII, c. 23), though it left the unfortunate Beck without the slightest legal redress.

"Up to the present moment Anglo-American public law is wholly opposed to granting an indemnity to such victims of the errors of criminal justice. The safe-guarding of society by the prosecution of crimes against it is, to be sure, an attribute inherent in all governments, one of the jura majestatis. For mistakes in exercising this sovereign right, says our law, there can be no liability of the state. We go even further. Whether the injury to the individual is accidental or intentional on the part of the state or on the part of the judge (except one of most inferior jurisdiction), the injured person is left without redress.

"Yet, within certain spheres of governmental action involving similarly a public interference with private rights, we admit freely that the state owes compensation to those individuals upon whom special damage is inflicted. When property is taken from individuals for the public use, our fundamental law prescribes that just compensation must be paid. Publicists as far back as Grotius, Puffendorf, and Bynkershoek recognize that compensation is a necessary incident to the exercise of the right of eminent domain. On the other hand, when in the administration of the criminal law, an equally sovereign right, society takes from the individual his personal liberty, a private right at least equally as sacred as the right of property, it dismisses him from consideration regardless of the gross injustice inflicted upon an innocent man without even an apology, much less compensation for the injury. Jurists who uphold the right of the state to prosecute and convict innocent persons without making compensation have been driven to draw fine distinctions between the taking of property and the taking of liberty for the public use.

 "May 7, 1935.
"Hon. Henry F. Ashurst,
 Chairman, Committee on the Judiciary,
 United States Senate, Washington, D. C.

"My Dear Mr. Chairman: I have your letter of March 27, requesting my views relative to the merits of the bill (S.2155) to grant relief to persons erroneously convicted in courts of the United States.

"This measure proposes to permit any person who has been convicted of any offense against the United States and who is thereafter found innocent of the crime or receives a pardon on the ground of innocence, to bring suit against the United States in the Court of Claims to recover

compensation for the pecuniary injury that he has sustained as a result of his erroneous conviction. The bill contains a maximum limitation of $5,000 on the amount that may be recovered in such a proceeding.

"I doubt whether a person who has been convicted and whose conviction is reversed before he has served any part of his sentence, should receive any compensation. Ideal justice would seem to require that in the rare and unusual instances in which a person who has served the whole or part of a term of imprisonment, is later found to be entirely innocent of the crime of which he was convicted, should receive some redress. On the other hand, reversals in criminal cases are more frequently had on the ground of insufficiency of proof or on the question as to whether the facts charged and proven constituted an offense under some statute. Consequently, it would be necessary to separate from the group of persons whose convictions have been reversed, those few who are in fact innocent of any offense whatever.

"The bill contains a proper safeguard in this respect by providing, in section 4, that the claimant shall have the burden of proving his innocence.

"I suggest that the word 'act' contained in that section (p. 2, line 11) be changed to 'crime'. In view of the limitation contained in section 4, it is hardly necessary to include a similar restriction in section 1. Consequently, the words 'to have been innocent' contained in that section (p. 1, line 6) may be well changed to 'not guilty'. Otherwise the measure may prove difficult of enforcement, since in our jurisprudence, there is no such verdict as 'innocent'.

"In view of the fact that the amount of the recovery is restricted to $5,000, I doubt the advisability of a further limitation of the compensation to the amount of 'the pecuniary injury', contained in section 1 (p. 2, line 1). I suggest that the word 'damages' be substituted for the phrase 'the pecuniary injury'.

"There appears to be a typographical error in the bill in the use of the word 'they' in section 6 (p.2, lines 19, 20) which should be changed to 'it' and in the use of the word 'their' (p.2, line 21) which should be changed to 'its'.

"Section 10, relating to the method of payment of judgments that may be rendered in proceedings brought under the act, appears to be unnecessary, since the procedure for the payment of all judgments rendered by the Court of Claims is now governed by general law.

"The bill in its present form seems to be fraught with some danger. If limited and amended in accordance with the foregoing suggestions, I think its enactment will make a desirable addition to the statutory law of the United States.

"Sincerely yours,
"Homer Cummings,
Attorney General."

After the Senate had passed its Bill, it was referred to the House Judiciary Committee, which redrafted it and reported it to the House in the form in which it was enacted into law. The report, in full, of the House Judiciary Committee, is as follows:

(Report No. 2299, 75th Congress, 3rd Session):

"The Committee on the Judiciary, to whom was referred the bill (S.750) to grant relief to persons erroneously convicted in courts of the United States, after consideration, report the same favorably to the House with an amendment with the recommendation that as so amended the bill do pass.

"The committee amendment is as follows: Strike out all after the enacting clause and insert in lieu thereof the following:

"That any person who, having been convicted of any crime or offense against the United States and having been sentenced to imprisonment and having served all or any part of his sentence, shall hereafter, on appeal or on a new trial or rehearing, be found not guilty of the crime of which he was convicted or shall hereafter receive a pardon on the ground of innocence, if it shall appear that such person did not commit any of the acts with which he was charged or that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the Unit-

ed States or the District of Columbia, in which the offense or acts are alleged to have been committed, and that he has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction, may, subject to the limitations and conditions hereinafter stated, and in accordance with the provisions of the Judicial Code, maintain suit against the United States in the Court of Claims for damages sustained by him as a result of such conviction and imprisonment.

"Sec. 2. The only evidence admissible on the issue of innocence of the plaintiff shall be a certificate of the court in which such person was adjudged not guilty or a pardon or certified copy of a pardon, and such certificate of the court, pardon, or certified copy of a pardon shall contain recitals or findings that—

"(a) Claimant did not commit any of the acts with which he was charged; or

"(b) that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the United States or the District of Columbia, in which the offense or acts are alleged to have been committed; and

"(c) that he has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction.

"Sec. 3. No pardon or certified copy of a pardon shall be filed with the Court of Claims unless it contains recitals that the pardon was granted after applicant had exhausted all recourse to the courts and, further, that the time for any court to exercise its jurisdiction had expired.

"Sec. 4. Upon a showing satisfactory to it, the court may permit the plaintiff to prosecute such action in forma pauperis. In the event that the court shall render judgment for the plaintiff, the amount of damages awarded shall not exceed the sum of $5,000.

"The purpose of this bill is to provide a method for granting relief to innocent persons who have been erroneously convicted and sentenced to imprisonment in the United States Courts, and who have served the whole or part of their sentence.

"The bill does not affect substantive or procedural criminal law. It merely proposes that certain innocent persons shall be able to present a claim for financial indemnity in the Court of Claims, providing they file certificates from the court or pardoning authority (the President) showing their innocence.

"The substitute proposed by the Judiciary Committee of the House differs from the bill which passed the Senate in certain respects, the most essential differences being as follows:

"(1) While both bills limit relief to one who is innocent and who is erroneously convicted, the House bill further limits the relief to those cases where the innocent victim has been sentenced to imprisonment and has served a whole or part of his sentence.

"(2) In the House bill, innocence must be established by the courts or pardoning authority before a claim for damages is presented in the Court of Claims, which only hears the question of damages. The Senate bill would give the Court of Claims jurisdiction to try the facts of the applicant's innocence.

"(3) According to the House substitute, the practice and procedure in the Court of Claims would be in accordance with its present practice and procedure, which follows the Judicial Code. In no event could an applicant recover more than $5,000.

"(4) While the Senate bill is limited to a person innocent 'of the crime with which he was charged and not guilty of any other offense against the United States', the House committee believes this is not definite and specific enough, and limited it instead to one who is 'not guilty of the crime of which he was convicted and did not commit any of the acts with which he was charged' and 'that his conduct in connection with the charge did not constitute a crime or offense against the United States or of the State or Territory in which the offense or acts are alleged to have been committed.' In other words, the claimant must be innocent of the particular charge and of any other crime or offense that any of his acts might constitute. The claimant cannot be one whose innocence

is based on technical or procedural grounds, such as lack of sufficient evidence, or a faulty indictment—such cases as where the indictment may fail on the original count, but claimant may yet be guilty of another or minor offense.

"(5) In connection with the last paragraph, attention is called to the case of a claimant who has been pardoned. The Senate bill would have the Court of Claims try the facts; but in the House bill, the courts or pardoning authority must try the facts and certify as to the innocence of the claimant and his freedom from commission of any other crime in connection with all the circumstances.

"In practice, the President grants pardons only after full hearings by the Department of Justice.

"No claimant, under the House bill, can present his petition in the Court of Claims without a pardon based on hearings and clearly defined findings. In addition, if he bases his claim on a pardon, it must be a pardon granted after he has exhausted the courts' jurisdiction.

"The principle underlying this measure has been applied in some extent in most European countries, but in the United States no attempt has been made to indemnify the victims who suffer by reason of mistakes in the criminal law.

"Attention is called to the following excerpt from an editorial by John H. Wigmore, dean, Northwestern University School of Law:

"The State is apt to be indifferent and heartless when its own wrongdoings and blunders are to be redressed. The reason lies partly in the difficulties of providing proper machinery, and partly in the principle that individual sacrifices must often be borne for the public good. Nevertheless, one glaring instance of such heartlessness, not excusable on any grounds, is the State's failure to make compensation to those who have been erroneously condemned for crime.

"There is plenty of analogy for such a measure. The Federal Court of Claims is a standing example of the general maxim that the State should fulfill its obligations and redress its wrongs by judicial inquiry and award. And a particular analogy here is found in the constitutional principle that compensation should be made for property taken for public purposes. To deprive a man of liberty, put him to heavy expense in defending himself, and to cut off his power to earn a living, perhaps also to exact a money fine—these are sacrifices which the State imposes on him for the public purpose of punishing crime. And when it is found that he incurred these sacrifices through no demerit of his own, that he was innocent, then should not the State at least compensate him so far as money can do so?

"Prof. Edwin M. Borchard has made extensive studies in this field and has written largely upon the subject. The following statement is an excerpt from Senate Document No. 974, Sixty-second Congress, third session, entitled 'State Indemnity for Errors of Criminal Justice,' by Edwin M. Borchard:

"In an age when social justice is the watchword of legislative reform, it is strange that society, at least in this country, utterly disregards the plight of the innocent victim of unjust conviction or detention in criminal cases. No attempt whatever seems to have been made in the United States to indemnify those unfortunate victims of mistakes in the administration of the criminal law, although cases of shocking injustice are of not infrequent occurrence. The case of Andrew Toth, who was convicted of murder in Pennsylvania, sentenced to life imprisonment, and after having served 20 years was found to have been absolutely innocent, is still fresh in the public mind.

"In England, the flagrant injustice meted out to Adolf Beck, who, through the most lax administration of the criminal law, was convicted for the crime of another man and was imprisoned for 7 years, resulted at least in the establishment of the court of criminal appeal (7 Edw. VII, C. 23) though it left the unfortunate Beck without the slightest legal redress.

"Yet, within certain spheres of governmental action involving similarly a public interference with private rights, we admit freely that the State owes compensation to those individuals upon whom special

damage is inflicted. When property is taken from individuals for the public use, our fundamental law prescribes that just compensation must be paid. Publicists as far back as Grotius, Puffendorf, and Bynkershoek recognize that compensation is a necessary incident to the exercise of eminent domain. On the other hand, when in the administration of the criminal law, an equally sovereign right, society takes from the individual his personal liberty, a private right at least equally as sacred as the right of property, it dismisses him from consideration regardless of the gross injustice inflicted upon an innocent man without even an apology, much less compensation for the injury. Jurists who uphold the right of the State to prosecute and convict innocent persons without making compensation have been driven to draw fine distinctions between the taking of property and the taking of liberty for the public use.

"The committee also calls attention to the many cases of the innocent who served years in prison, only to find later that injustice was done, as cited in the book by Prof. Edwin Borchard entitled 'Convicting the Innocent.' If we indemnify the taking of property, we should indemnify injustice to human beings."

From the above, it will clearly appear that Congress never intended that every imprisoned person whose conviction had been set aside, should be indemnified by the Government. Of his Bill, Prof. Borchard said (supra): "The granting of the relief is *discretionary*, as was stated in the beginning. Most of the European statutes generally present a list of conditions which shall bar or limit the right to the relief, but I consider it best to follow the French law, which makes no mention of limiting conditions, but leaves the judge to determine from all the circumstances of the case whether any and how much relief is proper."

In the Report of the Senate Committee, embodying therein the letter of the Attorney General, he says (supra):

"Ideal justice would seem to require that in the rare and unusual instances in which a person has served the whole or part of a term of imprisonment, is later found to be entirely innocent of the crime of which he was convicted, should receive some redress. On the other hand, reversals in criminal cases are more frequently had on the ground of insufficiency of proof or on the question as to whether the facts charged and proven constituted an offense under some statute. Consequently, it would be necessary to separate from the group of persons whose convictions have been reversed, those few who are in fact innocent of any offense whatever.

"The bill contains a proper safe-guard in this respect by providing, in Section 4, that the claimant shall have the burden of proving his innocence."

And in the report of the House Committee on the Bill which was enacted into law, the following appears (supra): "In other words, the claimant must be innocent of the particular charge and of any other crime or offense that any of his acts might constitute. The claimant cannot be one whose innocence is based on technical or procedural grounds, such as lack of sufficient evidence, or faulty indictment—such cases as where the indictment may fail on the original count, but claimant may yet be guilty of another or minor offense."

It is to be noted that in the Borchard Bill, as passed by the Senate, jurisdiction to try the facts of the applicant's innocence was given to the Court of Claims, the burden of proving his innocence being on the applicant.

As redrafted by the House Committee and enacted into the present law, the Bill provided that, "* * * innocence must be established by 'a certificate of the court in which such person was adjudged not guilty. * * *'", leaving to the Court of Claims only the question of damages. Although there is no specific provision in the statute as finally enacted, providing that the granting of a certificate of innocence should be in the discretion of the court, nor any specific provision that the burden of establishing his innocence should be upon the petitioner, yet both the legislative history of the law and the language of Sections *729* and *730* lead me to

the conclusion that in the present law discretion in the matter of granting a certificate is vested in the court; and in the sense that the court should not grant such certificate unless it is satisfied of petitioner's innocence, the burden is on the petitioner. Unless the law contemplated the exercise of discretion on the part of the court, there would be no point in requiring the certificate of the court. If no discretion were contemplated, and only a ministerial act was required, the clerk could certify the final finding of not guilty, just as well as the court.

As to the matter of burden of proof, of course nothing is more fundamental in our criminal jurisprudence than the principle that in a criminal trial, the accused person is entitled to the presumption of innocence throughout his trial, and that the burden is on the Government to overcome this presumption. However, the situation here presented is not a criminal trial: here, we have the situation of a person who has been once tried and convicted, then later found not guilty as the result of a reversal of his conviction by the Supreme Court, who is now asking the trial court to certify his innocence. He is no longer on trial: he is now seeking monetary indemnity from the Government. Therefore, he is the moving party, who asks the court to find and certify a fact. It would seem to me obvious that the burden is on the petitioner, at least to the extent that the court should not grant the certificate unless it is satisfied from the record before it that petitioner is altogether innocent.

### The Authorities.

■■ It seems to be a general rule of statutory construction, that a statute creating a claim against the Government should be strictly construed, and "may not by implication be extended to cases not plainly within its terms". Klamath and Moadoc Tribes v. United States, 296 U.S. 244, 250, 56 S.Ct. 212, 215, 80 L.Ed. 202. Furthermore, it seems to be well settled that statutes relaxing traditional governmental immunity from suit, or imposing new liability upon the Government, should be strictly construed. United States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct.

767, 85 L.Ed. 1058; United States v. Michel, 282 U.S. 656, 51 S.Ct. 284, 75 L. Ed. 598; Price v. United States, 174 U.S. 373, 19 S.Ct. 765, 43 L.Ed. 1011; Schillinger v. United States, 155 U.S. 163, 15 S. Ct. 85, 39 L.Ed. 108.

As to the particular statute here under consideration, counsel have not cited, nor can I find, any decision directly bearing upon the question here presented. However, the statute here under consideration, has been considered in four decisions of the Court of Claims, which are as follows:

Prisament v. United States, 92 Ct.Cl. 434: This was an action in which petitioner alleged that he was convicted of bank robbery in the United States District Court for the Middle District of Georgia, and was confined in the penitentiary until his innocence was established by the apprehension of the guilty parties, whereupon the plaintiff was granted a full pardon by the President of the United States, the pardon reciting that the plaintiff was innocent of the offense for which he was held. Petitioner relied entirely upon his pardon, and although it contained a recital of his innocence, the Court dismissed his petition for the reason that the pardon did not contain the recitals required by what are now Sections 730 and 731 of the Act. The Court refrained from passing on the question of whether the recital that, "The said Martin Prisament is innocent of the offense for which he is now being held", constitutes sufficient compliance with Subdivision (b) of Section 730, "as there is an absolute failure to state the matters required by Subdivision (c) * * *, or anything that would be the equivalent thereof." It would seem that this action of the Court does constitute a holding that subsections (b) and (c) of Section 730 are conjunctive, and that a certificate would be unavailing unless it contained the recitals set out in both subsections (b) and (c).

Viles v. United States, 95 Ct.Cl. 591: In this case, it appears that, although the passage of the Act was not until May 24, 1938, the pardon relied on by petitioner was granted on March 2, 1933, and the Court held that the petition must be dismissed because the Act, by its very terms, applied only to such cases as "shall hereafter" arise.

Hadley v. United States, 101 Ct.Cl. 112: Here, the petitioner was convicted and imprisoned by a Federal Court for entering a national bank in Texas with the intent of passing on said bank a forged check. While he was in prison, the Supreme Court delivered its opinion in the case of Jerome v. United States, 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640, holding that the entry into a national bank for the purpose of committing a felony against the laws of the state in which the bank was located, did not come within the term of Section 2 (a) of the Bank Robbery Act, 12 U.S.C. A. § 588b (a), under which the plaintiff had been convicted. The petitioner thereafter secured his release by habeas corpus. The Court said: "We do not need to decide whether plaintiff's release under habeas corpus brings him within the provisions of the Act of May 24, 1938, because it is clear that plaintiff's petition is fatally defective in that it does not allege that plaintiff did not commit the acts with which he was charged *and* that such acts did not constitute a crime against the State in which the acts were committed. This is a necessary allegation. The Act gives a prisoner a right of action against the United States only 'if it shall appear that such person did not commit any of the acts with which he was charged or that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the United States or the District of Columbia, in which the offense or acts are alleged to have been committed. * * *'. Although plaintiff may not have committed a crime against the United States, still he is not entitled to recover under the Act if the acts charged against him constituted a crime against the State in which the acts were committed." (Italics mine.)

It would seem that the use of the word, "and", underscored above, was ill considered, as the disjunctive, "or", is used in the statute.

Hadley v. United States, 106 Ct.Cl. 819, 820, 66 F.Supp. 140, 141: This case was the second action instituted by the same Hadley mentioned in the case above referred to. He proceeded this time by a suit for damages of $250,000 for false imprisonment. The Court said:

"It seems plain that plaintiff does not and cannot bring himself within the terms of that Act. It renders the United States liable to the extent of $5,000 if on new trial, rehearing, or appeal, or as a result of a pardon a person shall have been proven not to have been guilty of a crime for which he was convicted, provided (1) it shall appear he did not commit any of the acts with which he was charged; *and* (2) that his conduct did not constitute a crime against the United States or against the sovereignty within which the acts were committed; and (3) that he had not negligently or wantonly contributed to bring about his arrest or conviction. (Italics mine.)

"Not only must these facts appear, but they must appear in a certain way, that is, by a certificate of a court or a pardon containing a recital of these facts. The Act says that only such certificate or such a pardon, or certified copy thereof, is admissible to prove innocence. No such certificate nor such a pardon has been issued, as plaintiff's petition shows."

Again it would seem that the underscored, "and", should be, "or".

In dismissing the plaintiff's petition, the court refrained from passing on the question of whether or not an order in habeas corpus proceedings which contains the necessary recitals required by Section 730, would be a sufficient compliance with the Act.

As none of the cases cited herein consider the questions here presented, and I find no cases which do, it would seem that this is a case of novel impression.

### General Comments on the Statutes.

Section 730 is entirely silent as to what procedure a court should follow in determining whether or not a petitioner is entitled to a certificate. The fact that this duty has been imposed upon the trial court, would create the inference that the court would rely primarily on the record of the trial of petitioner had therein. It would seem that other relevant facts could be pre-

sented by affidavit. I have given the parties an opportunity to file affidavits herein. It would seem to me that rarely would it be necessary for the court to take oral testimony, but I can see no objection to such procedure should it seem advisable.

Subsection (a) of Section 730 is as follows: "Claimant did not commit any of the acts with which he was charged; or".

It is to be noted that this subsection is connected with the two following subsections (b) and (c) by the word, "or", which is disjunctive. Therefore, the disjunctive, as well as the language of the subsection, leads me to the belief that a certificate under this subsection would be sufficient, without any additional recitals under subsections (b) and (c). It seems to me that subsection (a) is applicable to such a case as mistaken identity, a striking example of which is the recent case of Bertram Campbell of New York, to which I have already referred. Campbell v. State, supra. Campbell was convicted of forgery, and after he had served a substantial part of his sentence, it appeared from the confession of another that this other person for whom Campbell had been mistaken, was the real culprit. Therefore, it appeared literally that Campbell "did not commit any of the acts with which he was charged."

■■■ Subsections (b) and (c) of Section 730, are as follows:

"* * * that his conduct in connection with such charge did not constitute a crime or offense against the United States or any State, Territory, or possession of the United States or the District of Columbia, in which the offense or acts are alleged to have been committed; and

"(c) That he has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction."

It is to be noted that these two subsections are connected by the conjunction, "and"; therefore, they are in the conjunctive, and a certificate would be of no avail unless it contained recitals under both subsections. The language of subsection (b), that his conduct " *in connection* with such charge did not constitute a crime * *" (Italics mine), leads me to the conclusion

that proof of some contemporaneous, but unrelated, crime should not preclude the granting of a certificate. In order for the commission of a crime other than that with which petitioner was charged, to constitute grounds for denial of his certificate, such other crime must have been "in connection with such charge".

The language of subsection (c) seems rather indefinite to me, but Prof. Borchard says that such a limitation was almost uniformly expressed in the European statutes. Examples of the misconduct referred to, as stated in some of the statutes, are: "Where there has been an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion."

### Conclusions as to this Petitioner.

■■■ Petitioner is not entitled to a certificate under subsection (a) of Section 730. I cannot certify that he *"did not commit any of the acts with which he was charged.":* the fact is that he did commit all of the acts with which he was charged, upon proof whereof, his conviction followed. His final acquittal resulted from the finding of the Supreme Court that proof that petitioner and his codefendants committed the acts with which they were charged, was insufficient evidence to sustain the conviction of *conspiracy,* the offense charged.

■■■ Neither do I think petitioner is entitled to a certificate under subsection (b). I am definitely not satisfied, "that his conduct in connection with such charge did not constitute a crime or offense against the United States", namely, the crime of counseling evasion of the Selective Service Law, that is, the substantive offense, as distinguished from the conspiracy.

During the course of the trial, a witness, who was a sympathizer or *forderer* of the German-American Bund, testified that petitioner made a speech at a meeting of a German Hiking Club in Buffalo early in 1942, which the witness attended. Speaking of petitioner's speech, the witness said: "He referred to his sons in the Army.

He felt kind of sorry about them, and he said, 'You boys are lucky in a way, you might evade military service because you are foreign born,' and the question popped up from the younger fellows how and why. Then he said, 'By claiming being a conscientious objector'."

It is true that the witness further said that, when he asked the petitioner, after the meeting, what would happen to him as a naturalized American citizen if he tried to evade military service by claiming to be a conscientious objector, Keegan told him he would lose his citizenship, and that the witness was later inducted. However, there was no denial of the testimony that petitioner told these young men of German origin, in response to their questions, without qualification, that they were lucky in that they might evade military service by claiming to be conscientious objectors.

It is also true that this testimony was referred to in the Supreme Court's opinion (Keegan v. United States, supra, 325 U.S. at page 489, 65 S.Ct. at page 1203, 89 L. Ed. 1745), and that at the conclusion of the majority opinion (325 U.S. at page 494, 65 S.Ct. at page 1210, 89 L.Ed. 1745), the Supreme Court stated: " * * * that the evidence and oral statements of the various petitioners at committee meetings and unit meetings of the Bund did not supply the basis for a finding, beyond a reasonable doubt of counselling, or intending to counsel, or conspiring to counsel, evasion of military service within the meaning of § 11 of the statute."

Of course, the statements that the evidence did not prove beyond a reasonable doubt that petitioners, or any of them, were guilty of the substantive crime of counseling evasion, was an obiter dictum, because the offense for which petitioner and his codefendants were convicted, and which conviction was under review, was the offense of conspiracy. The testimony quoted above that the petitioner did in fact counsel evasion, considered in connection with all the testimony in the case showing that petitioner and his codefendants were disposed to counsel evasion, would satisfy me beyond a reasonable doubt that petition-

er was in fact guilty of the substantive offense of counseling evasion. However, if the above quoted dictum of the Supreme Court is binding upon me as an adjudication that the testimony was insufficient to prove defendant guilty of counseling evasion beyond a reasonable doubt, the testimony is certainly sufficient to create so strong a belief in my mind that petitioner was guilty of counseling evasion, that I would not feel justified in certifying that he was not guilty of this crime.

Neither could I make the certificate contemplated by subsection (c), that is, that petitioner has not, either intentionally or by wilful misconduct, or negligence, contributed to bring about his arrest or conviction. Petitioner did not testify at his trial, but he did testify before the grand jury, and I have before me here excerpts from his testimony, and it clearly appears, in the light of the uncontradicted testimony at the trial, that this testimony was both evasive in part and false in part. Besides, although petitioner's counsel maintained throughout the trial that petitioner's only connection with the German-American Bund was as its legal adviser, the uncontradicted evidence showed that the petitioner was a member of the Bund and participated in its policy-making councils.

National Headquarters of the Bund prepared and published to the membership, Bund Command No. 37, which contained this language:

"We represent the standpoint, however, that An Induction into the Military Service is Not justified, in as far it concerns Bund members and American Germans, *for in the Selective Service Law the citizenship rights of Bund members and the defenders of Germandom are unconstitutionally severed!*

"Every Man, if he can, will Refuse *to do military duty until this law and all other laws of the country or the states which confine the citizenship rights of Bund members* Are Revoked! * * *"

The uncontradicted evidence at the trial showed that, besides other intimate connection with the Bund Command No. 37, containing the above quoted language, peti-

640

tioner read it in English to a meeting of the Bund in Brooklyn.

The Supreme Court has said that the promulgation of Bund Command No. 37 did not constitute counseling evasion of the Selective Service Law. However, such holding does not preclude me from the conclusion that petitioner's connection with this Bund Command, and his conduct in reading its contents to a Bund meeting, constitute wilful misconduct which contributed to bring about his arrest and conviction.

The Government contends that petitioner was, "in connection with" the charge of which he was convicted, guilty of conspiracy to induce others to make false statements and to furnish false information in their registration as aliens, and it is true that petitioner was indicted for this offense at the same time he was indicted upon the charge of which he was convicted. After the Supreme Court's reversal of petitioner's conviction, nolle prosequi was entered as to this indictment. If defendant was in fact guilty of conspiracy in connection with the Alien Registration Act, possibly that would constitute a crime "in connection with" the crime of which he was convicted. However, I do not think that the record before me is sufficient to justify any finding or belief of petitioner's guilt in connection with the Alien Registration Act, and I deem it unnecessary to pursue any further investigation in this connection.

The Government also contended in oral argument (Transcript, p. 31 et seq.), that although it does not appear of record, if necessary, the Government would prove that petitioner was guilty of wilful misconduct, which should preclude the granting of his application in that, for some time prior to his indictment, the petitioner undertook to act as an informant for the Government, while in fact he was actually withholding vital evidence from the Government. As the petitioner's application is to be denied for other reasons, it would seem useless to pursue this inquiry.

### Conclusion.

From the foregoing, it follows that an order will be entered denying petitioner's application for a certificate of innocence. I am satisfied that the facts and circumstances here presented do not make out such a case as Congress meant to include within the humane provisions of the statute here under consideration.