**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4106**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ROBERT E. GRAHAM,

        Defendant - Appellant,

    and

STATE OF WEST VIRGINIA,

        Party-in-Interest.

**No. 07-4332**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ROBERT E. GRAHAM,

        Defendant - Appellant,

    and

STATE OF WEST VIRGINIA,

        Party-in-Interest.

Appeals from the United States District Court for the Southern District of West Virginia, at Beckley. David A. Faber, Chief District Judge. (5:06-cr-00025)

---

Argued: December 5, 2007                    Decided: March 13, 2008

---

Before MICHAEL and GREGORY, Circuit Judges, and John Preston BAILEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Reversed by unpublished per curiam opinion.

---

**ARGUED:** Michael Warren Carey, CAREY, SCOTT & DOUGLAS, P.L.L.C., Charleston, West Virginia, for Appellant. Hunter P. Smith, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** John A. Kessler, CAREY, SCOTT & DOUGLAS, P.L.L.C., Charleston, West Virginia, for Appellant. Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a bench trial, the appellant, Robert E. Graham ("Graham") was convicted of stealing $31,129 from his employer, the Council on Aging, Inc. ("COA"), an agency receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).[1]  Graham appeals the district court's judgment, contending that (1) there is not substantial evidence to support his conviction, (2) the district court clearly erred in considering conduct for which Graham was acquitted as "relevant conduct" for sentencing purposes, and (3) the district court improperly ordered forfeiture.  After a thorough review of the evidence, we reverse Graham's conviction.

---

[1](a) Whoever, if the circumstance described in subsection (b) of this section exists--

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that--
(I)  is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency...

shall be fined under this title, imprisoned not more than 10 years, or both.

    (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives in any one year period, benefits in excess in $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

3

I.

The facts underlying this dispute are undisputed. For over two decades, Graham was the Executive Director of two nonprofit organizations, COA and All Care Home and Community Services, Inc., ("All Care"). The organizations worked together to identify and provide services reimbursed by state and federal programs, including Medicaid, to qualified recipients. Both COA and All Care shared the same Board of Directors ("the Board"). Prior to the Board's quarterly meetings, Graham would send each board member a packet of documents that included an agenda for the meeting, the minutes from the previous board meeting, check registers, program reports and "Director's Notes." Graham wrote the "Director's Notes" and the minutes from each meeting.[2]

Until 2001, Graham did not have a written contract with either COA or All Care. This changed in December 2001, when Graham provided the Board with two essentially identical employment contracts for himself, one for each agency ("twin contracts"). The Board president signed both contracts. For purposes of this case, the relevant provision in each of the twin contracts concerned Graham's sick leave:

> SICK LEAVE/PERSONAL BUSINESS: From the date of employment sometime around May 1975 till the termination of employment, Employee shall be entitled to one day per month of accumulating Sick Leave, beginning on the first

---

[2]Occasionally, there was another person at the meeting who would take minutes as well.

4

date of Employee's employment. Sick leave may be accumulated and carried over from year to year. Sick leave benefits may be converted into cash compensation if used for illnesses or upon the termination of this contract.

(J.A. 955, 961.) In March 2002, Graham prepared an amended contract between himself and COA that consolidated the twin contracts into one. The Board president signed the consolidated contract. In essence, the terms of the consolidated contract provided Graham with the same cumulative benefits he received under the twin contract framework. For example, the consolidated contract combined Graham's salaries and sick leave from the twin contracts. The sick leave provision in the consolidated contract, like the previous twin contracts, only allowed Graham to cash out his sick leave under two circumstances: illness or termination. (J.A. 977.)

In preparation for the January 27, 2003, Board meeting, Graham sent out "Director's Notes" in which he wrote, in part:

I am requesting to buy out some of my sick leave. It shows in the books as an accrual. I can already but [sic] out my vacation.

(J.A. 1001.) The minutes from that Board meeting stated that the Board unanimously approved Graham's request to "buy accrued leave." (J.A. 1003.) On the same day, Graham cashed out 1200 hours of accrued sick leave which totaled $106,728 (gross) and $56,953.16 (net). (J.A. 1005-1110.)

Subsequently, Graham's Director's Notes for the next two board meetings on March 27, 2003, and May 14, 2003, included the following identical request to continue buying out his accrued leave:

> I am requesting permission to continuing [sic] buying out my vacation/annual and sick leave. It shows in the books as an accrual. I can already but [sic] out my vacation.

(J.A. 1012; 1019.) In the Director's Notes for the May 14, 2003, meeting, Graham also added the following line to his request: "This is the same as the notice from the last Board meeting." (J.A. 1019.) The Board approved both requests. Unlike his previous cash outs in January, Graham did not cash out accrued sick leave immediately after either of these Board meetings. However, on June 18, 2003, Graham filed two written requests to cash out a total of 250 hours of accrued sick leave. (J.A. 1308.) Both requests were approved by the Treasurer of the Board, Hazel Lusk (Lusk). Subsequently, Lusk approved three more requests for Graham to cash out additional accrued sick leave on the following dates: July 29, 2003 (350 hours), January 14, 2004 (250 hours), February 10, 2004 (100 hours). (J.A. 1308.) The total amount of accrued sick leave Graham cashed out in 2003 and 2004 was $191,221.81 (gross) and $107,788.56 (net). (J.A. 1308.)

Beginning in January 2003, federal authorities launched an investigation into COA's business operations. By March 2003, West Virginia authorities commenced their own investigation into COA.

6

On March 10, 2004, while West Virginia authorities were in COA's office reviewing records, the Board called an emergency meeting during which Graham's consolidated contract was revoked although the Board offered Graham continuing employment under revised terms. During the meeting, the Board also ordered Graham to repay all the sick leave he cashed out in 2003. The Board did not demand that Graham pay back the sick leave Graham cashed out in 2004. On March 11, 2004, Graham repaid COA the net proceeds of the sick leave he cashed out in 2003 and on March 26, 2004, he repaid COA the net proceeds of the sick leave he cashed out in 2004.

On July 18, 2006, a federal grand jury returned a second superceding 39 count indictment against Graham. After pleading not guilty to all of the charges and waiving his right to a jury trial, Graham's bench trial commenced on July 24, 2006. On August 30, 2006, the district court found Graham guilty of Count 14 of the Second Superceding Indictment, which charged Graham with stealing $31,129 from COA in 2004 by cashing out his sick leave in violation of his employment contract and 18 U.S.C. § 666. In addition, the district court ordered Graham to forfeit $31,129 as proceeds traceable to the 18 U.S.C. § 666 violation. The district court acquitted Graham on the remaining 38 counts.[3]

_____

[3]It is worth noting that Count 13 mirrored Count 14, except that it concerned Graham's allegedly improper cash outs of accrued sick leave in 2003. However, because the district court found that Graham had only violated the consolidated contract by cashing out his leave in June and July 2003, but not in January 2003, the

7

The Pre-Sentencing Report (PSR) concluded that Graham's offense level was 16. Included in that calculation was a +2 adjustment because Graham abused a position of trust that "facilitated the commission or concealment" of his crime.[4] U.S.S.G. § 3B1.3. The PSR stated that this provision was applicable because the Board "rubber stamped" all of Graham's decisions (J.A. 1312) and Graham took advantage of the Board's trust in order to facilitate his criminal conduct. Since Graham had no criminal history points, he was placed in Criminal History Category I. Based on a total adjusted offense level of 16 and a Criminal History Category of I, the advisory guideline sentence for Graham equaled 21-27 months.

The district court adopted the PSR's finding and sentenced Graham to 24 months imprisonment, a three year term of supervised release, and fined him $10,000. In addition, the district court ordered Graham to forfeit $31,129. Graham timely appealed the district court's judgment.

---

district court found him not guilty as to that count.

[4]Despite Graham's objection to the application of a two point enhancement for abuse of trust, the district court found that because of the Board's vulnerability and the fact that Graham effectively controlled the Board, the two point adjustment was proper. In addition, Graham objected to the loss calculation in the PSR because it included payments in 2003 for which he was acquitted. The district court denied Graham's objection, finding that since the payments Graham received in June and July 2003 were obtained without Board approval, those incidents were properly included as relevant conduct for purposes of sentencing.

In determining whether sufficient evidence exists to support a conviction, the appropriate inquiry is whether, taking the evidence in the light most favorable to the Government, any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  See e.g., U.S. v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) ("The standard governing our review is whether there is substantial evidence, taking the view most favorable to the Government, to support [the jury verdict] and we have defined substantial evidence, in the context of a criminal action, as that evidence which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  (internal citations and quotation marks omitted.))  We now apply this standard to the facts in this case.

In its memorandum order, the district court found Graham guilty of Count 14 because:

> . . . the conclusion is inescapable that Graham cashed in the sick leave without the approval of his board, knowing he needed board approval, thereby effectively stealing the money or converting it to his own use.  From the evidence taken at trial it is clear that defendant, an employee, took this money from COA without having any board approval whatsoever.  These transactions each constituted major changes of the sort that required board approval.  The fact that Graham sought board approval for the earlier cash outs of sick leave is compelling evidence that he knew such approval was required. Graham cavalierly disregarded the board and treated large amounts of COA's money as if it were his own, diverting

9

it to his personal use and to the detriment of those whom COA and All-Care were created and funded to serve.

(J.A. 156.)  The district court's holding was motivated by the fact that on three prior occasions Graham sought the Board's approval to cash out accrued sick leave.  As a result, the district court reasoned that Graham knew that he needed board approval for each instance he cashed out accrued sick leave since the cash outs were impermissible under the terms of the consolidated contract.

The Government argues that there is substantial evidence to support the district court's decision.  The Government contends that the evidence at trial demonstrates that Graham took advantage of a Board that was comprised of elderly, disabled, and uneducated men and women who rubber stamped all of his decisions.  The Government argues that Graham should have explicitly informed the Board about how much sick leave he was actually going to cash out and made certain that the Board understood that his request was inconsistent with the terms of his contract.[5]

---

[5]In support of its argument, the Government also cites to evidence that the district court did not rely on, including the fact that Graham used some of the sick leave cash out money to buy things for his girlfriend.  In addition, the Government contends that cashing out accrued sick leave was inconsistent with the written policy of COA and that Graham only reimbursed COA after the media began publishing stories about Graham's contract with COA. While these facts may demonstrate that Graham is not eligible for the priesthood, they are irrelevant so far as the district court's determination of guilt is concerned.  As the district court concluded:

The events leading to this indictment are improper and outrageous and cannot be condoned by the court.  Graham

10

In order to convict Graham under 18 U.S.C. § 666, the district court had to find, beyond a reasonable doubt, that Graham knowingly stole funds from COA. On this critical matter, we believe both the district court and the Government reached the wrong conclusion. Quite simply, Graham's cash outs in June and July of 2003 and January and February of 2004 were not contrary to the authority given to him by the Board. The Board repeatedly authorized Graham to buy out his accrued sick leave and did not place any restrictions on the amount of accrued sick leave he could cash out or the timing of these cash outs. As such, the timing and amount of the accrued leave cash outs are clearly insufficient for purposes of establishing Graham's intent to steal funds from COA.

In addition, the Board's actions during the March 2004 emergency meeting provide strong circumstantial evidence that it did not believe Graham violated any Board directives or that he attempted to bamboozle the Board in order to bilk COA out of hundreds of thousands of dollars. While the Board did reduce Graham's salary and benefits, it did not ask for Graham's

----

failed miserably to fulfill his duties as a public servant, engaging in conduct that squandered public resources and adopting a life-style that reflected discredit upon COA and All-Care, their directors and employees. Bad conduct in and of itself, however, does not equal criminal conduct. To convict a defendant of a crime, the Government must establish beyond a reasonable doubt by competent evidence each and every element of each and every crime charged.

(J.A. 912.)

11

resignation. In fact, Graham's salary and benefits were not reduced as a punitive measure, but rather at the behest of Graham in order to quell the media maelstrom that had overwhelmed the organization. (J.A. 1044.) As the Board stated in its summary of the emergency meeting:

> "[t]he Directors of the [COA] are very proud of the success and growth of the [COA] and believe that Robert E. Graham has worked diligently and on behalf of the [COA] for over 25 years and has brought success to the [COA] and regrets that the press has not emphasized such accomplishments."

(J.A. 1044.)

III.

In summary, the salient facts in the instant case, taken in the light most favorable to the Government are as follows: Graham received the Board's permission to cash out an indeterminate amount of his accrued sick leave. There was nothing in any of the Board's decisions that placed any limitations on when and how much accrued sick leave Graham could cash out. According to COA's independent audit, the gross value of Graham's accrued sick leave as of September 30, 2002, was $241,167. (J.A. 1087.) The total gross amount of sick leave Graham cashed out in 2003 and 2004 was $191,221.81, an amount that he conceivably could have cashed out in January 2003 without violating any of the Board's decisions.

Based on these facts, a reasonable trier of fact could not find, beyond a reasonable doubt, that Graham knowingly stole any

12

money from COA.  Graham's consolidated contract with COA entitled him to cash out his accrued sick leave upon his termination or due to illness; however, the Board's decisions in January, March, and May of 2003 resulted in a de facto amendment that overrode these restrictions.  In essence, the Board gave Graham the ability to cash out his accrued sick leave early without any limitation as to the amount of accrued sick leave he could cash out or a specific time period when such cash outs had to occur.

In addition, the evidence in the record clearly rebuts any accusation that Graham was trying to hide his cash outs in June/July 2003 and January/February 2004 - Graham filled out the proper leave forms to cash out his accrued sick leave on each occasion and the Board's treasurer approved the forms and signed the checks.  The record is replete with minutes, notes, checks, and records of Graham's transactions, all of which were open to review by COA's independent auditors and COA's Fiscal Officer.[6]  Indeed, the fact that Graham continued to cash out accrued sick leave after January 2003, the point at which the federal investigation into COA commenced, provides striking evidence that Graham did not knowingly steal any money from COA.

While we recognize that the amount of money cashed out by Graham is substantial, that issue is ultimately irrelevant because

---

[6]In fact, at one point, COA's Fiscal Officer questioned Graham's cash outs, and Graham accurately told her that the Board had approved the cash outs.

Graham had properly accrued all of that sick leave money during his tenure at COA and All Care. The pertinent question is whether the Board authorized him to cash out his sick leave in June/July 2003 and January/February 2004. We answer this question in the affirmative because on this record it is undisputed that the Board repeatedly authorized Graham to cash out his accrued sick leave without any limitations.

IV.

Based on the reasoning above, we reverse Graham's conviction and sentence and remand to the district court to enter a judgment of not guilty as to Count 14 of the Second Superceding Indictment.[7]

REVERSED

---

[7]Because we are reversing Graham's conviction, it is unnecessary to address Graham's remaining contentions.