PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

　　　　v.

ROBERT E. GRAHAM,

　　　　　*Defendant-Appellant.*

No. 09-6013

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
David A. Faber, Senior District Judge.
(5:06-cr-00025-1)

Argued: January 27, 2010

Decided: June 16, 2010

Before MICHAEL, MOTZ, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the majority opinion, in which Judge Michael joined. Judge Gregory wrote a dissenting opinion.

## COUNSEL

**ARGUED**: Harry Preston Henshaw, III, Charleston, West Virginia, for Appellant. Hunter Paul Smith, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Vir-

ginia, for Appellee. **ON BRIEF:** Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

After the Government charged Robert E. Graham with 39 criminal offenses, he opted for a bench trial. The district court found him not guilty of all offenses except that charged in Count 14—embezzlement from his employer, an organization receiving in excess of $10,000 annually in federal funds. *See* 18 U.S.C. § 666 (2006). Graham appealed his sole conviction, and we reversed, holding that the Government had offered insufficient evidence to prove, "beyond a reasonable doubt, that Graham knowingly stole any money" as alleged in Count 14. *See United States v. Graham*, 269 F. App'x 281, 286 (4th Cir. 2008) (per curiam). Graham then moved for a certificate of innocence, a necessary prerequisite to recovery of damages from the Government for unjust conviction and imprisonment. *See* 28 U.S.C. §§ 1495, 2513 (2006). Concluding that Graham had not met the statutory prerequisites for a certificate of innocence, the district court refused to grant him one. Graham appeals. Because the district court did not abuse its substantial discretion in denying the certificate, we affirm.

### I.

### A.

Graham served as executive director of two related non-profit corporations—the Council on Aging, Inc. ("COA") and All Care Home and Community Services, Inc. ("All Care")—for more than twenty years. The corporations, which shared a Board of Directors, provided services to the elderly and infirm and received well over $10,000 annually in federal funds.

For many years, Graham had no written employment contract with either corporation. However, in December 2001, he prepared and submitted employment contracts, which the Board's president signed. The contracts raised Graham's annual salary from $125,000 to $185,000.

In March 2002, COA agreed to assume responsibility for All Care's administrative expenses, including Graham's salary and benefits, and entered into an amended employment contract with Graham so providing. This amended contract contains the following sick-leave provision:

> Beginning on the date of employment sometime around May 1975 until the termination of employment, [Graham] shall be entitled to accrue two days (16[ ]hours) per month paid sick leave time. Sick leave may be accumulated from year to year. Sick leave benefits may be converted into cash compensation if used for illnesses or upon the termination of this contract.

Thus, the contract authorized Graham to convert his sick-leave benefits into cash compensation under only two circumstances—"illness[ ] or . . . termination of th[e] contract."

Nevertheless, in January 2003, without meeting these conditions, Graham sought Board permission to convert some of his sick leave to cash. Graham offered the Board the following brief justification for the request: "I am requesting permission to buy out some of my sick leave. It shows in the books as an accrual. I can already bu[y] out my vacation." The Board granted his request, and on that same day, Graham converted 1200 sick-leave hours to $106,728. Two more times in the spring of 2003, again without meeting the contractual conditions, Graham requested and received Board permission to convert some of his sick leave to cash. In all, during 2003, Graham converted sick leave to over $160,000 in cash.

Graham never again asked the Board to approve his conversion of sick leave to cash. But in both January and February 2004, again without meeting either of the contractual conditions, he converted sick leave to cash. In total, during 2004, Graham converted sick leave to over $30,000 in cash.

In response to ongoing state investigations of COA, the Board called an emergency meeting in March 2004, at which it revised the terms of Graham's employment contract and ordered Graham to return the money he received for sick leave in 2003. That same month, Graham heeded his attorney's advice and repaid all the money he had received for sick leave in both 2003 and 2004.

In July 2006, a federal grand jury in the Southern District of West Virginia returned a second superseding 39-count indictment against Graham. Both counts 13 and 14 charged him with embezzling money from COA by unauthorized conversion of sick leave to cash. *See* 18 U.S.C. § 666.[1] Count 13 charged him with embezzling $160,092.81 in calendar year 2003; Count 14 charged him with embezzling $31,129 in 2004.

Graham pled not guilty to all counts and waived his right to a jury trial. During his five-day bench trial, the Government offered substantial evidence that at all relevant times, the COA Board members were elderly (their average age exceeded 80), hard of hearing, financially unsophisticated, and strongly influenced by Graham. The Government argued that this evidence required the district court to find that Gra-

---

[1]Section 666 prohibits an agent of an organization receiving in any one-year period federal benefits in excess of $10,000 from "embezzl[ing], steal[ing], obtain[ing] by fraud or otherwise without authority knowingly convert[ing] to the use of any person other than the rightful owner or intentionally misappl[ying]" property owned or controlled by that organization and carrying a value of $5000 or more. 18 U.S.C. § 666. Graham's intent constituted the only disputed element at trial.

ham could, and did, take advantage of the Board at every turn and so find him guilty of all 39 counts in the indictment.

The district court refused to so find. Rather, after the trial, at which Graham did not testify, the court acquitted Graham of all crimes but that charged in Count 14—embezzlement from his employer of $31,129 through sick-leave conversions to cash in 2004. Thus, the court found Graham not guilty of mail fraud, wire fraud, tax violations, embezzlement related to the purchase of a plasma television and the maintenance of a SEP IRA plan, or embezzlement with respect to the 2003 sick-leave conversion charged in Count 13. *United States v. Graham*, No. 5:06-00025, 2006 WL 2527613 (S.D.W. Va. Aug. 30, 2006).

The court explained its differing finding as to Counts 13 and 14 as follows:

> Evidence establishes that, in 2003, defendant went to the boards of COA and All-Care and requested board approval prior to cashing in sick leave. The board's sanction of defendant's behavior, regardless of the ability of its members to fully comprehend the intricacies of the organizations' finances, leads this court to conclude that defendant did not violate 18 U.S.C. § 666(A)(1)(a) as to Count Thirteen. Even though the court doubts that the board members comprehended in detail all of the matters before them, they did consent. Their assent, regardless of their level of competence, creates a reasonable doubt as to Count Thirteen.
>
> On the other hand, the evidence at trial did establish that defendant was guilty of Count Fourteen. It shows clearly that he did not return to the board and seek the same approval for his last buy out of sick leave even though he knew he was supposed to do so.

. . . .

. . . [T]he conclusion is inescapable that Graham cashed in the sick leave [in January and February 2004] without the approval of his board, knowing he needed board approval, thereby effectively stealing the money or converting it to his own use.

From the evidence taken at trial it is clear that defendant, an employee, took this money from COA without having any board approval whatsoever. These transactions each constituted major changes of the sort that required board approval. The fact that Graham sought board approval for the [2003] cash-outs of sick leave is compelling evidence that he knew such approval was required. Graham cavalierly disregarded the board and treated large amounts of COA's money as if it were his own, diverting it to his personal use and to the detriment of those whom COA and All-Care were created and funded to serve.

*Id.* at *3-4.

As to the other counts—related to the plasma television, SEP IRA plan, and federal taxes –- the court concluded that although Graham's conduct was "doubtlessly improper and unethical," *id.* at *1, and "inconsistent with Graham's duties as Executive Director," *id.* at *2, the Government had failed to prove beyond a reasonable doubt that Graham harbored the requisite intent to commit the crimes charged. *Id.* at *1-2, *4; *see* 18 U.S.C. § 666; 26 U.S.C. § 7206 (2006). The court similarly acquitted Graham of various fraud charges, *see* 18 U.S.C. §§ 1341, 1343, 1346 (2006), finding that the Government had not proven that Graham devised a scheme to defraud his employer. *Graham*, 2006 WL 2527613, at *2-5.

The district court concluded that

[t]he events leading to this indictment are improper and outrageous and cannot be condoned by the court. Graham failed miserably to fulfill his duties as a public servant, engaging in conduct that squandered public resources and adopting a life-style that reflected discredit upon COA and All-Care, their directors and employees. Bad conduct in and of itself, however, does not equal criminal conduct. To convict a defendant of a crime, the government must establish beyond a reasonable doubt by competent evidence each and every element of each and every crime charged. Except for Count Fourteen, the government has failed to do so.

*Id.* at *5. The court imposed on Graham a within-Guidelines sentence of two years in prison and a $10,000 fine, and ordered him to forfeit any portion of the funds charged as stolen in Count 14 that he had not already returned.

Graham appealed, and we reversed his sole conviction on sufficiency grounds. *Graham*, 269 F. App'x at 286-87. We concluded that, because in 2003, "[t]he Board repeatedly authorized Graham to buy out his accrued sick leave and did not place any restrictions on . . . the timing of these cash outs," his failure to obtain Board approval in 2004 for the cash payments of sick leave was "clearly insufficient for purposes of establishing Graham's intent to steal funds." *Id.* at 286. Although Graham's written contract permitted him to receive cash payment for sick leave only upon illness or termination, we held that "the Board's decisions in January, March, and May of 2003 [to permit cash payment of sick leave in circumstances not permitted in the employment contract] resulted in a de facto amendment that overrode these restrictions." *Id.*

We pointed to several other facts suggesting Graham did not intentionally steal from COA, including the Board's decision to maintain Graham as executive director in March 2004

after the federal and state investigations of COA had begun, Graham's decision to continue to obtain cash for sick leave after the federal investigation began in early 2003, and his filling out the proper paperwork and obtaining approval from the Board treasurer for all of the sick-leave conversions to cash. *Id.* at 286-87. Although we recognized that certain other facts—for example, that Graham's conversions of sick leave ran afoul of COA's written personnel policies—"may demonstrate that Graham is not eligible for the priesthood," we found them "irrelevant so far as the district court's determination of guilt is concerned." *Id.* at 285 n.5.

We issued our mandate on March 20, 2008, and on that same day the district court entered an order adjudging Graham not guilty. At that time, Graham had spent thirteen months in prison.

B.

On July 21, 2008, Graham filed an action in the United States Court of Federal Claims seeking damages from the Government for unjust conviction and imprisonment. *See* 28 U.S.C. §§ 1495; 2513. Two months later, Graham moved in this court for a certificate of innocence, a necessary prerequisite to the Federal Claims action. *Id.* § 2513. We dismissed the motion without prejudice, noting that the "reversal of appellant's conviction was not based on technical or procedural grounds, but law and fact; therefore, a certificate of innocence is appropriate in accordance with . . . § 2513." However, we concluded that "the district court is the most appropriate court to issue the certificate."

Graham then moved for a certificate of innocence in the district court, which the court denied. After examining the relevant statutory language, the court concluded that § 2513 does not mandate the payment of public funds to everyone acquitted after being imprisoned. Rather, the statute "orders compensation to the truly innocent who have been prosecuted

through no fault of their own." *United States v. Graham*, 595 F. Supp. 2d 681, 684 (S.D.W. Va. 2008). The court noted that the few precedents interpreting § 2513 (and its predecessors) agreed that the statute "provides a remedy to be applied only in exceptional cases." *Id.*

The district court determined that it was "unable to reach . . . the conclusions mandated by 28 U.S.C. § 2513" as a necessary condition to the award of a certificate of innocence. *Id.* at 686. Specifically, the Court found itself "not persuaded that Graham is in fact innocent," nor able to "conclude that he did not by misconduct or neglect bring about his own prosecution." *Id.*

The court first catalogued the trial evidence, which it believed demonstrated that Graham was not actually innocent: Graham (1) "selected and controlled the Board[ ] . . . which w[as] composed entirely of the elderly," (2) took home an annual salary of $185,000, which was "excessive by comparison to the pay of others in similar positions," (3) "used employees on company time to perform personal services for himself and his family," (4) "bought . . . a $6,000 television[ ] through COA to get a better price and avoid sales taxes," (5) "manipulated a SEP IRA to benefit his family," and (6) "assumed a lavish lifestyle including regular visits to a 'gentlemen's club.'" *Id.* at 685. This evidence led the court to conclude that "Graham operated [COA and All Care] for years as his own personal domain and for the financial benefit of himself and his family." *Id.*

The court then explained why it found that Graham's "misconduct or neglect cause[d] or br[ought] about his own prosecution." 28 U.S.C. § 2513(a)(2). First, the court found that the enumerated evidence of Graham's wrongdoing "certainly shows that, in a general sense, [Graham] brought about his own prosecution." *Graham*, 595 F. Supp. 2d at 686. Specifically, the court found that Graham was "at the very least negligent" in not seeking Board approval before converting his

sick leave to cash in 2004, as he had in 2003. *Id.* The court explained that Graham "either simply neglected to do so or he purposely failed to do so for some specific reason such as the belief his request would not be approved. In either event his own conduct brought about his prosecution . . . ." *Id.*

The district court expressly recognized that on appeal, we had "carefully reviewed the evidence against Graham on the count of conviction and concluded that it was insufficient to establish his guilt beyond a reasonable doubt." *Id.* The court did not challenge this holding. Rather, the court explained that while the evidence at trial had been found "insufficient to prove [Graham's] guilt beyond a reasonable doubt," this evidence left the court unconvinced "that Graham is in fact innocent, [or] that [Graham] did not by misconduct or neglect bring about his own prosecution." *Id.*

Graham timely noted this appeal.

II.

This case presents our first opportunity to address § 2513. Nor has the Supreme Court ever construed, or even cited, the statute. But the clear statutory language, its legislative history, and the cases that have previously considered the statute provide us substantial guidance.

Section 2513, the "[u]njust conviction and imprisonment" act, provides:

> (a) Any person suing under section 1495 of this title [which waives sovereign immunity for suits seeking money damages from the Government, to be filed in the Court of Federal Claims] must allege and prove that:
>
> > (1) His conviction has been reversed or set aside on the ground that he is not guilty of

the offense of which he was convicted, . . . as appears from the record . . . of the court setting aside or reversing such conviction, . . . and

(2) He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution.

(b) Proof of requisite facts shall be by a certificate of the court or pardon wherein such facts are alleged to appear, and other evidence thereof shall not be received.

28 U.S.C. § 2513.

Thus, the plain language of § 2513 requires that one seeking a certificate of innocence (who has not been pardoned) *prove* three predicates. He must prove that (1) "the record . . . of the court setting aside or reversing" his conviction demonstrates that it did so "on the ground that he is not guilty of the offense of which he was convicted," § 2513(a)(1); (2) he "did not commit any of the acts charged" or those acts "constituted no crime against the United States, or any State, Territory or the District of Columbia," § 2513(a)(2); and (3) "he did not by misconduct or neglect cause or bring about his own prosecution," *id.*

After setting forth these three requirements, § 2513 specifically characterizes them as "requisite facts." § 2513 (b). Then, the statute expressly sets forth the *only* way (again absent pardon) that a person can demonstrate these "requisite facts" in the Court of Federal Claims—by a certificate from the court

in which "such facts are alleged to appear." *Id.* This intricate statutory scheme renders several conclusions inescapable.

First, Congress clearly did not provide in the unjust conviction and imprisonment act an avenue for monetary compensation to all whose criminal convictions are reversed after incarceration. *See Betts v. United States*, 10 F.3d 1278, 1284 (7th Cir. 1993); *United States v. Keegan*, 71 F. Supp. 623, 635 (S.D.N.Y. 1947). Rather, "the phrasing of the Act and its legislative history proclaim the care with which its framers guarded against opening wide the door through which the treasury may be assailed by persons erroneously convicted." *United States v. Brunner*, 200 F.2d 276, 280 (6th Cir. 1952); *see also* H.R. Rep. No. 75-2299, at 2 (1938), *quoted in Keegan*, 71 F. Supp. at 633 (noting that Congress enacted this statute to provide only "certain innocent persons" the ability "to present a claim for financial indemnity" upon "showing their innocence"). As the Eighth Circuit has recently recognized, § 2513 "compensates only the truly innocent." *United States v. Racing Servs., Inc.*, 580 F.3d 710, 712 (8th Cir. 2009) (citing *Betts*, 10 F.3d at 1284).[2]

---

[2]The legislative history of § 2513 clearly demonstrates a congressional desire to limit the class of persons entitled to relief under the statute. In commenting on the proposed legislation, Attorney General Homer Cummings noted that "[i]deal justice would seem to require that in the rare and unusual instances in which a person who has served the whole or part of a term of imprisonment, is later found to be *entirely innocent*," he should "receive some redress." S. Rep. No. 75-202, at 3 (1937) (emphasis added), *quoted in Keegan*, 71 F. Supp. at 632. The Attorney General went on to distinguish the "entirely innocent," who would merit a certificate of innocence, from those who would not—the "more frequent[ ]" cases in which reversal was based "on the ground of insufficiency of proof or on the question as to whether the facts charged and proven constituted an offense under some statute." *Id.* He concluded that any proposed legislation should "necessar[ily] . . . separate from the group of persons whose convictions have been reversed, those few who are in fact innocent of any offense whatever." *Id.*

Second, and just as clear as its intent to permit only the "truly innocent" to receive a § 2513 certificate, Congress expressly directed that one seeking the certificate bear the burden of not only "alleg[ing]" but also "prov[ing]" entitlement to the certificate. 28 U.S.C. § 2513(a); *see also Betts*, 10 F.3d at 1286; *Rigsbee v. United States*, 204 F.2d 70, 72 (D.C. Cir. 1953); *Keegan*, 71 F. Supp. at 635-36; *Burgess v. United States*, 20 Cl. Ct. 701, 704 (Ct. Cl. 1990). Moreover, because it constitutes a waiver of sovereign immunity, "[t]he unjust conviction statute has always been strictly construed." *Burgess*, 20 Cl. Ct. at 704; *Osborn v. United States*, 322 F.2d 835, 838 (5th Cir. 1963); *Keegan*, 71 F. Supp. at 636 ("[A] statute creating a claim against the Government should be strictly construed, and may not by implication be extended to cases not plainly within its terms." (internal quotation marks omitted)). Thus, § 2513 imposes a rigorous burden on those who seek a certificate of innocence.

Third, as every court to consider the question has held, "[t]he decision to deny a certificate of innocence is committed to the sound discretion of the district court." *Racing Servs.*, 580 F.3d at 713; *Betts*, 10 F.3d at 1283; *Rigsbee*, 204 F.2d at 72; *Eastridge v. United States*, 602 F. Supp. 2d 66, 69 (D.D.C. 2009); *Keegan*, 71 F. Supp. at 635-36. Accordingly, we review a district court's denial of a certificate of innocence for abuse of discretion, *e.g.*, *Racing Servs.*, 580 F.3d at 711-12, and "must affirm [that] decision unless the court abused its discretion, or unless the findings underlying its decision were clearly erroneous." *Betts*, 10 F.3d at 1283. When a district judge has exercised his substantial discretion to deny a certificate of innocence, "we cannot require him to stultify himself by certifying an opinion contrary to his real conviction—no matter what our own view might be—except, perhaps, in a case in which the refusal to certify innocence was completely capricious and without rational basis." *Rigsbee*, 204 F.2d at 72; *see also Humphrey v. United States*, 52 Fed. Cl. 593, 597 (Fed. Cl. 2002) (noting the district court's

"broad discretion in deciding whether or not to issue" a certificate of innocence), *aff'd*, 60 F. App'x 292 (Fed. Cir. 2003).

### III.

Graham does not challenge any of the above principles. Indeed, he expressly concedes that the district court had discretion to determine his entitlement to a certificate of innocence, and that we "must affirm" absent abuse of this discretion or unless the "findings underlying" it "were clearly erroneous." Petr.'s Br. 4. Given our deferential review, however, even if we assume that the district court abused its discretion in finding Graham ineligible for a certificate of innocence under § 2513(a)(1) and the first clause of § 2513(a)(2),[3] Graham has not demonstrated that the court abused its discretion in concluding that he failed to meet his burden under the second clause of § 2513(a)(2), i.e. that "he did not by misconduct or neglect cause or bring about his own prosecution." We must therefore affirm the district court's denial of Graham's motion for a certificate of innocence.

Consistent with § 2513, the factfinder designated by Congress—the district court—reviewed all the evidence relevant to Graham's conduct and state of mind, and found that Graham was "at the very least negligent" in failing to seek Board approval before obtaining cash for sick leave in 2004, and that this neglect brought about his prosecution. *Graham*,

---

[3]It is not at all clear that the district court did abuse its discretion in relying on § 2513(a)(1) and the first clause of § 2513(a)(2). On direct appeal, we concluded only that the Government failed to prove Graham harbored the requisite intent. This may suggest that Graham's conviction was "reversed or set aside on the ground that he is not guilty of the offense of which he was convicted" and that he "did not commit any of the acts charged." 28 U.S.C. § 2513(a)(1), (2). But reversal based on "failure of proof beyond a reasonable doubt" also "leaves room for the possibility that the petitioner in fact committed the offense with which he was charged." *Betts*, 10 F.3d at 1284; *see also Racing Servs.*, 580 F.3d at 712; *Osborn*, 322 F.2d at 840; *Keegan*, 71 F. Supp. at 632, 634-35.

595 F. Supp. 2d at 686. Ample record evidence supports that finding. Indeed, in his first appeal in our court, Graham expressly conceded that he "needed Board approval to cash out sick leave," Petr.'s Reply Br. in No. 07-4106, at 4 n.2, *available at* 2007 WL 1702675, and we noted that Graham's 2004 conversions of sick leave were inconsistent with both COA's written policies and the employment contract Graham prepared and executed. *Graham*, 269 F. App'x at 285 n.5, 286. The district court recited numerous other facts in its account of Graham's "sordid tale of abuse of a position of public trust," *Graham*, 595 F. Supp. 2d at 686, and did not abuse its discretion in concluding that they constituted "neglect" that provided cause for Graham's prosecution.

In fact, when Graham informed his lawyer in 2004 of his sick-leave cash payments, his lawyer advised him that he could not legally cash in his sick leave, and recommended that he return the funds. J.A. in No. 07-4106, at 356. Although the attorney's conclusion proved inaccurate as a matter of law, *see Graham*, 269 F. App'x at 286-87, it obviously constituted prudent and reasonable advice in light of the facts at hand. In contrast, Graham's marked lack of prudence—particularly his repeated failure to seek Board approval for substantial sick-leave conversions that violated the terms of an employment contract he had prepared—supports the district court's finding that Graham's neglect "brought about his own prosecution." These omissions, combined with substantial evidence of Graham's imprudent stewardship of COA, constitute a reasonable basis for Government officers to prosecute, leading them to conclude (as indeed the trier of fact did) that Graham committed a federal offense by stealing from his employer.

Graham relies heavily on the Seventh Circuit's opinion in *Betts*, the only court of appeals decision to find an abuse of discretion in a district court's denial of a certificate of innocence. *Compare Racing Servs.*, 580 F.3d at 714 (affirming denial of certificate of innocence), *Osborn*, 322 F.2d at 843

(same), *and Rigsbee*, 204 F.2d at 72-73 (same), *with Betts*, 10 F.3d at 1286 (reversing denial of certificate); *see also Brunner*, 200 F.2d at 280 (reversing grant of certificate).[4] The court in *Betts* held that a petitioner fails to satisfy the second clause of § 2513(a)(2) only when he has "acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense." *Id.* at 1285. Although the *Betts* court acknowledged that "[n]either the statute nor the legislative history elucidates what kind of misconduct or neglect will bar relief, and [that] the case law is sparse," *id.* at 1284, the court concluded that Congress intended to preclude a certificate "'[w]here there has been an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion,'" *id.* at 1285 (quoting *Keegan*, 71 F. Supp. at 638).

We reject this narrow reading of subsection (a)(2) because it effectively reads "neglect" out of the statute. Each of the *Betts* court's enumerated examples implicates some element of *wrongful* intent. Indeed, the Seventh Circuit appears to limit denial on "neglect" grounds to situations in which "a defendant has it within his means to avoid prosecution but *elects* not to do so." *Id.* (emphasis added). Tellingly, the *Betts* court draws its examples of "neglect" from the discussion in *Keegan* of "willful misconduct," *see Keegan*, 71 F. Supp. at 638, not of conduct that constitutes "neglect" (or "negligence," the prior statutory term), which *Keegan* never addresses. Although *Betts* seeks to avoid a reading of § 2513 that "would require courts to assess the virtue of a petitioner's behavior even when it does not amount to a criminal offense,"

---

[4]A casual reader might conclude from our analysis that federal courts of appeal have regularly had occasion to consider certificates of innocence. In fact, although Congress first enacted a certificate of innocence statute in 1938, *Keegan*, 71 F. Supp. at 626, this opinion cites to *all* published circuit-court opinions interpreting § 2513 or its predecessors. *See Racing Servs.*, 580 F.3d 710; *Betts*, 10 F.3d 1278; *Osborn*, 322 F.3d 835; *Rigsbee*, 204 F.2d 70; *Brunner*, 200 F.2d 276.

10 F.3d at 1285, the statute's "misconduct or neglect" language on its face captures noncriminal conduct and thus requires just such an assessment.

Moreover, even if we did accept the *Betts* construction of § 2513, we could not conclude that the district court abused its discretion here. The court found that, given that the written contract did not permit the sick-leave-to-cash conversions and that Graham had obtained Board approval to modify the contract in 2003, his failure to do so in 2004 at the very least constituted neglect and provided prosecutors a basis for charging that he intentionally stole from his employer. Graham's repeated failure to seek Board approval in 2004, while insufficient to establish guilt beyond a reasonable doubt, could reasonably be said to constitute "omission[s] by the petitioner that misle[d] the authorities as to his culpability." *Betts*, 10 F.3d at 1285.

Further, nothing in our opinion reversing Graham's conviction foreclosed the district court's finding that Graham's neglect caused his prosecution. Rather, we expressly cabined our reversal, holding only that "a reasonable trier of fact could not find, beyond a reasonable doubt, that Graham knowingly stole any money from COA." *Graham*, 269 F. App'x at 286. In reversing Graham's criminal conviction, we had no occasion to address the question of his "misconduct or neglect," but instead expressly limited our analysis to his claim of insufficient evidence. *See id.* at 287 n.7. The closest we came to a discussion of "misconduct or neglect" was to acknowledge the damning nature of some of the evidence against Graham, but to distinguish it from proof necessary for conviction. *Id.* at 285 n.5 ("[T]hese facts . . . are irrelevant so far as the district court's determination of guilt is concerned"). Our conclusion that "[i]n essence, the Board gave Graham the ability to cash out his accrued sick leave early without any limitation," *id.* at 286—which we reached in narrowly addressing the issue of criminal intent—left open the possibility that Graham nonetheless acted with neglect in failing to take the pru-

dent, established course of seeking Board approval to circumvent express company policy.

What Graham refuses to recognize is that the Government's failure to offer sufficient evidence to prove his guilt does not require the district court, in considering the same evidence, to find him entitled to a certificate of innocence. *See, e.g.*, *Racing Servs.*, 580 F.3d at 712 ("A reversal of the criminal conviction based on insufficiency of the prosecution's evidence does not entitle the defendant to a certificate of innocence.") At trial, the Government had to prove, as a matter of fact, that Graham acted with a guilty state of mind, *e.g.* that he intended to steal from his employer. We have held that the Government failed to meet its burden of proof on this issue, and so reversed his conviction. But to obtain a certificate of innocence, Graham must address the same issue and prove, as a matter of fact, not only that he acted with no criminal intent but also that no "neglect" on his part caused his prosecution.

The district court exercised its discretion to conclude that Graham, who presented no evidence in support of his application, failed to prove this. We can discern nothing "completely capricious and without rational basis," *Rigsbee*, 204 F.2d at 72, in that conclusion. Although a reasonable trier of fact might disagree, the district court's finding was surely reasonable in light of the record evidence.

In sum, the district court's painstaking, fact-intensive analysis of the evidence that had been admitted during Graham's five-day bench trial resulted in a conclusion consistent with § 2513, supported by the facts, and permitted (perhaps even suggested) by our earlier decision. *See Graham*, 269 F. App'x at 285 n.5. The district court, which acquitted Graham on 38 of 39 counts, expressly recognized the difference between "[b]ad conduct" and "criminal conduct." *Graham*, 2006 WL 2527613, at *5. And while we have held Graham's neglectful conduct irrelevant in determining his criminal guilt, § 2513 renders this evidence relevant, indeed critical, in determining

his eligibility for a certificate of innocence. We find no abuse of discretion.

IV.

Before concluding, we must briefly respond to the dissent's contention that we have misread the second clause of § 2513(a)(2). Our friend in dissent maintains that this clause requires a petitioner to prove only that he did not cause his prosecution by "misconduct or neglect" that is "*separate*" from the charged conduct. (Dissent at 28 (emphasis added).)

The plain language of the statute forecloses this theory. Section 2513(a)(2) provides that in addition to proving that "[h]e did not commit any of the acts charged" or that those acts are not criminal, a petitioner must prove that "he did not by misconduct or neglect cause or bring about his own prosecution." 28 U.S.C. § 2513(a)(2). The statute does not in any way limit the type of causative "misconduct or neglect" that will bar relief. To make its argument then, the dissent must (and does) insert a modifier—"other," "additional," "subsequent," or "separate"—before "misconduct" in the second clause of § 2513(a)(2). (*See* Dissent at 23, 27, 28.) Thus, under the dissent's view, the statute would require a petitioner to prove only that "he did not by ["other" or "additional" or "subsequent" or "separate"] misconduct or neglect cause or bring about his own prosecution."[5] Congress could have so legislated. But it did not.

---

[5]The dissent interprets a statute of its own creation. In addition to adding these words to § 2513(a)(2), the dissent repeatedly ignores other statutory language. Hence, the dissent asserts that one may somehow "elect" to be "neglect[ful]" (Dissent at 32), and that misconduct taking place once a prosecution "ha[s] already begun" can nonetheless "cause or bring about" that very prosecution (*id.* at 28). The dissent would rewrite the second clause of § 2513(a)(2) to bar relief only when, after a prosecution "ha[s] already begun," a petitioner commits intentional misconduct that in and of itself furnishes probable cause for charges "separate" from that misconduct. (*See id.* at 28 & n.2.) Congress, however, has chosen a different path.

Rather, the plain language of the statute dictates that any "misconduct or neglect" that "cause[s] or bring[s] about" a petitioner's prosecution renders him ineligible for a certificate of innocence. In the face of the unambiguous words of the statute, we cannot construe § 2513(a)(2) to add language that Congress omitted. *See United States v. Deluxe Cleaners & Laundry, Inc.*, 511 F.2d 926, 929 (4th Cir. 1975) (noting that it is not "permissible to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume . . . that it failed to state something other than what it plainly stated" (internal quotation marks omitted)). This is so particularly when the statute we interpret waives sovereign immunity. *See Middlebrooks v. Leavitt*, 525 F.3d 341, 347 (4th Cir. 2008) (noting that "waivers of sovereign immunity 'must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires'" (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992))). Indeed, the Supreme Court has directed that proper statutory construction "begins with the language of the statute," and when, as here, "the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal quotation marks omitted).

Contrary to the dissent's suggestion, our decision to give effect to the plain language of the statute, and our refusal to add to or disregard any of its language, does not "conflate[ ]" the first and second clauses of § 2513(a)(2) or render the first clause "incoherent or unnecessary." (Dissent at 28-29.) The first clause requires a petitioner to prove that he did not commit the charged criminal acts or that they do not constitute a crime; the second clause requires him to prove that his misconduct or neglect did not cause or bring about his prosecution. The first clause addresses criminal conduct; the second addresses acts of "misconduct or neglect." Therefore, the two clauses require a court to ask two distinct questions about the defendant's conduct. Even the dissent recognizes that a per-

son may commit an act constituting misconduct or neglect without committing a crime. (*See id.* at 28 (listing examples).)[6]

Nothing in § 2513(a)(2) (or in simple logic) requires the conclusion that a finding that a given act is not a crime mandates a finding that it does not constitute "misconduct or neglect." Rather, because only acts of "misconduct or neglect" that "cause or bring about" a petitioner's "own prosecution" disqualify him from relief, it seems likely that those acts often will have originally been charged as crimes, as they were here. In the dissent's view, however, only acts that do not garner criminal charges of their own (and yet somehow cause the levying of other charges) may prevent a petitioner from receiving compensation from the Government under the second clause of § 2513(a)(2). But an appellate court's holding that certain acts are not criminal surely does not eliminate the possibility that those acts nonetheless constitute "misconduct or neglect" that "cause[d]" the prosecution. Indeed, in *Keegan*, one of the first and most exhaustive interpretations of what is now § 2513, the court concluded that the petitioner

---

[6]The dissent's interpretation of § 2513(a)(2) also fails to account for the statute's purpose, to "compensate[ ] only the truly innocent," *Racing Servs.*, 580 F.3d at 712, by examining the petitioner's conduct and the prosecutors' charging decisions in light of the "entire record," *Brunner*, 200 F.2d at 280. To avoid confronting the statute's true purpose, the dissent invents a new one, asserting that when Congress drafted the second clause of § 2513(a)(2), it wished to create "an estoppel defense that protects the United States Treasury against defendants who could have thwarted a prosecution that had already begun, but instead went to prison and then attempted to collect money damages." (Dissent at 27.) Not only is this asserted purpose completely unsupported by caselaw or legislative history, but it rests on the assumption that Congress's primary concern in drafting § 2513(a)(2) was that criminal defendants innocent of any crime would "elect" to face federal prosecution—and in fact would "elect" to go to prison—in the hopes that they could subsequently prove their innocence and then sue for damages. We are not aware of any criminal defendant who has attempted such a feat. Therefore, it seems extremely unlikely that Congress would create legislation to prevent recovery in such circumstances.

did not qualify for a certificate of innocence in part because the very conduct for which he was charged "constitute[d] wil[l]ful misconduct which contributed to bring about his arrest and conviction." 71 F. Supp. at 640.

In sum, it is the dissent that offers a "novel interpretation" of § 2513, which if adopted would create a circuit split. (*See* Dissent at 23.) Although, as explained within, we disagree with the Seventh Circuit's cramped reading of the statute, neither that court nor any other has held that acts charged as crimes but ultimately found not to be criminal cannot constitute acts of misconduct or neglect causing the petitioner's prosecution. In fact, as noted above, even if we adopted the statutory construction of the *Betts* court, we would have to hold that the district court in this case did not abuse its discretion in denying Graham a certificate of innocence. For even the *Betts* court concluded that the disqualifying misconduct or neglect need only constitute "an affirmative act or an omission by the petitioner that misleads the authorities as to his culpability." 10 F.3d at 1285. Graham's failure in 2004 to seek Board approval to modify his contract so as to convert sick leave to cash certainly constitutes such an act or "omission."[7]

---

[7]Surprisingly, the dissent advances a broader definition of "neglect" that Graham has never advocated, perhaps because he recognizes that, if adopted, that definition would doom even a suggestion of recovery under § 2513. (*See* Dissent at 30 n.3 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (defining "neglect" in another statute as "encompass[ing] both simple, faultless omissions to act and, more commonly, omissions caused by carelessness")).) For if "neglect" in § 2513 "encompasses . . . simple, faultless omissions to act," *Pioneer*, 507 U.S. at 388, as the dissent apparently believes, then it is obvious that the district court acted within its discretion in denying Graham a certificate based on his "faultless omissions" in failing to seek Board approval in 2004. The district court did not adopt this broad definition of "neglect." Instead, the court equated "neglect" with "negligence"—perhaps relying on the fact that Congress originally used the term "negligence" in the statute, and replaced it with "neglect" only to "clarify ambiguities." *See* Revisor's Notes, 28 U.S.C. § 2513. Because the definition of "neglect" the court adopted is *more favorable* to petitioners like Graham than the definition the dissent prefers, it is no wonder that Graham does not ask us to find error in the district court's definition of "neglect."

V.

We of course regret that Graham suffered imprisonment for an unsupported conviction. However, Congress has determined that this unfortunate fact alone does not establish eligibility for damages against the Government. Rather, § 2513 vests the court that heard the evidence at trial with the discretion to ascertain not just whether a defendant is not guilty, but whether he is in fact entitled to a certificate of innocence. Because the district court did not abuse that discretion, we must affirm.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

Both the district court and the majority misconstrue § 2513, imposing a standard of their own design in place of what is required by the statute. Congress made clear that in order to recover under § 2513, a petitioner must prove that the *charged acts* did not constitute a crime. Separately, a petitioner must prove that he did not cause his own prosecution through some other misconduct or neglect. The majority errs by conflating these two elements, requiring a petitioner to show not only that the charged acts were not criminal *but also* that those acts conform to some amorphous, unwritten code of conduct. Today, through its novel interpretation of the statute, the majority creates a circuit split and encourages the government to prosecute acts it deems "immoral" rather than acts that are criminal under the law.

I.

In order to obtain a certificate of innocence and collect money damages for wrongful imprisonment, a petitioner must satisfy three requirements under 28 U.S.C. § 2513. He must prove: 1) "the record . . . of the court setting aside or reversing such conviction" establishes that "his conviction has been

reversed or set aside on the ground that he is not guilty of the offense of which he was convicted," § 2513(a)(1); 2) either "he did not commit any of the acts charged" *or* "his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia," § 2513(a)(2); and 3) "he did not by misconduct or neglect cause or bring about his own prosecution," § 2513(a)(2).

The majority relies on the substantial discretion afforded to the district court in determining whether or not a petitioner has successfully met his burden under the statute. *See* Maj. Op. at 2, 13-14. However, this case cannot rest on the district court's discretion because the district court's failure to correctly apply the statute is an error of law, which is necessarily an abuse of discretion. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). Under the majority's reading, a person who has met the standard set forth in § 2513(a)(1) must not only show that they are truly innocent under the first prong of § 2513(a)(2), but additionally that the same, non-criminal conduct does not constitute negligence under the second prong of § 2513(a)(2). Inserting this extraneous impediment into the statute is unwarranted and unsupported by the law. I therefore would reverse the district court and remand with instructions to grant the certificate of innocence.

### A.

The first two requirements under the statute, § 2513(a)(1) and the first prong of § 2513(a)(2), evince Congress' intent to compensate only those who are "truly innocent," both of the charges for which they were convicted and any other crime which their conduct could constitute. *See Betts v. United States*, 10 F.3d 1278, 1284 (7th Cir. 1993) (citing *Burgess v. United States*, 20 Cl.Ct. 701, 704 (1990) ("Consequently, it would be necessary to separate from the group of persons

whose convictions have been reversed, those few who are in fact innocent of any offense whatever.") (citation omitted).

The majority first contends that it is "unclear" if Graham met his burden to prove his actual innocence under § 2513(a)(1) and the first prong of § 2513(a)(2), asserting that this Court merely held that "the Government failed to prove Graham harbored the requisite intent," and therefore reversed his conviction based on insufficiency of the evidence. Maj. Op. at 14 n.3. However, we made plain in reversing Graham's conviction that no crime was committed. *United States v. Graham*, 269 F. App'x 281, 286 (4th Cir. 2007).

In overturning his conviction, we held that Graham was not required to return to the Board for permission to convert his sick-leave to cash. *See id.* at 286 ("Quite simply, Graham's cash-outs in June and July of 2003 and January and February of 2004 were not contrary to the authority given to him by the Board."). The majority makes much of the fact that Graham failed to seek the Board's permission in light of the limitations his employment contract placed on his ability to convert sick-leave to cash. Per the terms of his contract, he was only allowed such a pay-out only upon illness or termination. However, we explicitly acknowledged those contractual conditions and held that "the Board's decisions in January, March, and May of 2003 resulted in *a de facto amendment that overrode these restrictions*." *Id.* (emphasis added). Graham's employment contract term was thus altered by the party empowered to do so — the Board. Our decision reversing Graham's conviction was therefore not based on some technicality or procedural issue, but rather on finding Graham "truly innocent" of the crime for which he was convicted. "[T]he record of . . . the court reversing" Graham's conviction thus demonstrates that the "conviction has been reversed or set aside on the ground that [Graham] is not guilty of the offense of which he was convicted," as is mandated by § 2513(a)(1).

Additionally, in no way does the record below support the inference that Graham was guilty of some other, unindicted

crime, as is prohibited by § 2513(a)(2). Instead, it is clear that the government pursued every possible charge against Graham. Graham's indictment contained thirty-nine counts, only one of which resulted in a conviction. Although the majority points to the district court's recitation of "Graham's 'sordid tale of abuse of a position of public trust,'" Maj. Op. at 15 (citing *United States v. Graham*, 595 F. Supp. 2d 681, 686), none of that behavior was found to be illegal or even evidence of some further crime of which the government was unable to obtain proof. *Compare*, *United States v. Keegan*, 71 F. Supp. 623, 633-34, 635, 639 (S.D.N.Y. 1947) (holding that denial of a certificate of innocence is appropriate in cases "where the indictment may fail on the original count, but claimant may yet be guilty of another or minor offense"). It is indisputable that Graham's conduct "constituted no offense against the United States, or any State, Territory or the District of Columbia," as is required under § 2513(a)(2).

Because Graham's conviction was not overturned on procedural grounds, and nothing in the record indicates that the conduct for which Graham was acquitted somehow constitutes a different crime against the United States, Graham clearly met his burden under both § 2513(a)(1) and the first clause of § 2513(a)(2) to show that he was truly innocent.

B.

Beyond the initial question of whether a petitioner is truly innocent, the final clause of § 2513(a)(2) requires a petitioner to show "he did not by misconduct or neglect *cause* or *bring about his own prosecution*." 28 U.S.C. § 2513(a)(2) (emphasis added). "The statute expressly requires a *causal connection* between the petitioner's conduct and his prosecution; it does not preclude relief simply because the petitioner engaged in misconduct or neglect period." *Betts*, 10 F.3d at 1285 (emphasis added). It must follow that to give meaning to all words in the statute, one cannot "cause" one's own prosecution by engaging in the very conduct which was found to be

non-criminal in the first part of the inquiry. Instead, the second prong of the statute must be referring to some *additional* conduct, be it intentional or unintentional, willful or neglectful, which misleads the authorities into continuing their investigation of, and ultimately prosecuting, a person later cleared of criminal wrongdoing. To say otherwise conflates the "acts, deeds, or omissions in connection with [the] charge" referenced in the first clause of § 2513(a)(2) and the "misconduct or neglect" required in the second clause.

Congress made clear that the two inquiries are fundamentally different. A petitioner must show that the underlying conduct for which he was charged was "no offense against the United States, or any State, Territory, or the District of Columbia." § 2513 (a)(2). In other words, the only thing that a petitioner must prove regarding his underlying conduct is that *it was not a crime*. The second clause of § 2513(a)(2) requires the petitioner show that no other, subsequent conduct during the course of the government's investigation induced the government to commence a wrongful prosecution. *Id.* Essentially, the "misconduct or neglect" prong is an estoppel defense that protects the United States Treasury against defendants who could have thwarted a prosecution that had already begun, but instead went to prison and then attempted to collect money damages.[1]

---

[1]The majority's reading of my view in dissent continues to ignore the fact that the statute requires a petitioner to show that his "misconduct or neglect" did not *cause* his prosecution. In zeroing in on the first clause of § 2513(a)(2), the majority repeatedly asserts that "Graham's failure in 2004 to seek Board approval to modify his contract so as to convert sick leave to cash certainly constitutes . . . an act or 'omission.'" Maj. Op. at 22. One can certainly speculate as to whether or not Graham's conduct at COA constituted "misconduct or neglect." But the statute requires something more: a *causal link* between those actions and the prosecution at issue. Neither the district court nor the majority has or can point to how Graham's conduct, for which he was charged and ultimately acquitted, *caused* his prosecution.

Any other reading of the statute would be nonsensical. Why would Congress explicitly specify that a petitioner need only prove that the "acts, deeds, or omissions" for which he was charged "constituted no offense against the United States," only to further require in the next clause proof that those same acts were not an offense against any private entity, public decorum or social mores? If Congress intended this result, surely it would not have limited a petitioner's burden regarding the charged acts to offenses against the State; instead it would have remained silent or at minimum broadened the offenses to include more than actual crimes. But it did not do so. Instead, the statute clearly demarcates the sphere of charged acts as separate from the "misconduct or neglect" which "cause or bring about . . . [the] prosecution."[2] Thus, a petitioner could cause his own prosecution by giving a false confession, removing evidence, or by failing to disclose clearly exculpatory evidence within his possession, either intentionally or carelessly. Though this list is not exhaustive, it certainly encompasses conduct which constitutes misconduct and neglect, which, under § 2513(a)(2), could cause the petitioner's prosecution.

Rather than recognize the separate nature of the two prongs of § 2513(a)(2), the majority conflates the two and affirms the district court's finding that "Graham was 'at the very least *negligent*' in failing to seek Board approval before obtaining cash for sick leave in 2004, and that *this neglect* brought about his prosecution." Maj. Op. at 14 (citing *Graham*, 595 F. Supp. 2d at 686) (emphasis added). In equating "neglect" with "negligence" and then applying it to the charged conduct, the

---

[2]It is important to distinguish between conduct that could cause a government *investigation* and that which would cause a *prosecution*. Improper corporate stewardship could be grounds for government investigation to determine whether or not a crime has been committed. It would not be reasonable, however, to prosecute unless the government had probable cause to believe that the defendant's conduct satisfied all of the elements of the crime. This is another example of the majority's failure to analyze the words actually used by Congress in the statute.

majority renders the first clause of § 2513(a)(2) incoherent or unnecessary, thereby violating a basic cannon of statutory construction. *See Corley v. United States*, 129 S. Ct. 1558, 1566 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation omitted)). As stated above, if Congress intended for district courts to re-evaluate the charged conduct under a *lower standard of culpability*, it would not have limited the charged conduct to offenses against the State, nor would it have distinguished the acts associated with the charged conduct from the "misconduct or neglect" that "causes or brings about" the prosecution. It is a distortion of the statute to hold that the very act which was found to be "no offense against the United States" could mislead the government into prosecuting a defendant and thereby preclude recovery. If "charged conduct" and "misconduct and neglect" are really interchangeable as the majority's reading requires, then there is no foreseeable scenario in which someone wrongfully imprisoned could recover. After all, even a person prosecuted for simply being at the wrong place at the wrong time could easily be said to have been at the wrong place through his own "neglect."

The majority rejects the Seventh Circuit's decision in *Betts v. United States*, which also holds that the "misconduct and neglect" prong does not apply to the charged conduct, but rather requires some additional conduct which "mislead[s] the authorities into thinking [petitioner] had committed an offense." 10 F.3d at 1285. The majority's only basis for doing so is that "this narrow reading of subsection (a)(2) . . . effectively reads 'neglect' out of the statute." Op. at 16. Instead, it asserts that the "statute's 'misconduct or neglect' language on its face captures noncriminal conduct" and therefore the charged conduct should be reassessed under a negligence standard. *Id.* at 17. Yet, what the majority fails to recognize in summarily dismissing the reasoning of the one circuit that has specifically interpreted the second clause of § 2513(a)(2) is that *Betts* specifically accounts for both affirmative miscon-

duct and careless omissions.[3] *Betts*, 10 F.3d at 1285 (holding that petitioner must have "acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense"). Thus, contrary to the majority's assertion, the Seventh Circuit interpreted the statute in its entirety and gave the statute its most natural reading.[4]

---

[3]When Congress uses "neglect" without otherwise specifying, it means "carelessness." *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'Ship*, 507 U.S. 380, 388 (1993) ("The word therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness."). The majority reads neglect out of the statute and replaces it with "negligence." It must do so in order to maintain that the "misconduct or neglect" prong refers to the same conduct as the "acts charged" prong, while at the same time reading the statute to allow recovery for a person charged with completely non-culpable conduct, i.e., simple carelessness. The majority can only have it both ways by replacing the word actually used by Congress with a word that it would prefer.

The much easier reading of the statute, and the one that gives Congress' intended effect to the word "neglect," is to read the "acts charged" and "misconduct or neglect" prongs separately. Under this reading, an individual prosecuted for the crime of simple carelessness, even though there is not and has never been a crime of simple carelessness, could rightfully recover for wrongful prosecution. On the other hand, the individual wrongfully prosecuted for a crime he truly did not commit, but who nonetheless carelessly fails to turn over exculpatory evidence in his possession, would be barred from recovery. This application gives meaning to every word in the statute and is consistent with the array of estoppel defenses available in the law.

[4]Even if we were to assume arguendo that neglect somehow constitutes negligence, Graham's failure to seek Board approval for converting sick-leave to cash cannot be considered negligent when there was no duty breached. The majority did not even define the standards under which it measured Graham's alleged negligent conduct. In order for a cause of action to lie in negligence, the proponent must show there was a duty of care owed. In reversing Graham's conviction, we held that Graham was not required to return to the Board to obtain permission to cash-out his sick leave, *see Graham*, 269 F. App'x at 286, and therefore had no duty to return and get permission. Thus, even under the majority's own reading of the statute, Graham would have met the requirements and should have been issued a certificate of innocence.

The majority's strained statutory construction imputes to Congress a vision of government power that is anathema to the rule of law. Consider the statement that "Graham's imprudent stewardship of COA, constitute[s] a reasonable basis for Government officers to prosecute," Maj. Op. at 15, regardless of the fact that being a "sub-par" executive is clearly not criminal.[5] The district court described Graham's misconduct as including:

> Graham operated [COA and All Care] for years as his own personal domain and for the financial benefit of himself and his family. His $185,000 annual salary, excessive by comparison to the pay of others in similar positions, was supplemented by the generous cash-out of sick leave Graham arranged for himself. . . . Graham used employees on company time to perform personal services for himself and his family; bought at least one expensive item, a $6,000 television, through COA to get a better price and avoid sales taxes; manipulated a SEP IRA to benefit his family; and assumed a lavish lifestyle including regular visits to a "gentlemen's club." "Bailey," a dancer at Graham's favorite club, on whom he lavished gifts and money, inquired where his money came from.

*Graham*, 595 F. Supp. at 685. The majority repeats this recitation at page eleven of its opinion. Clearly both the district court and the majority are offended by this conduct. However, being over-paid, living a lavish lifestyle, and frequenting strip clubs, for better or worse, are not crimes in this country.

Only probable cause to believe that a person committed acts that satisfy the elements of a crime gives the government

---

[5]Again, conduct which is not criminal, but leads to a government investigation, is categorically different from conduct which *causes* one's prosecution.

reasonable basis to prosecute. The enduring principles on which our government was founded make it clear that the government does not have a reasonable basis to prosecute a person engaged in immoral or "bad conduct" if that conduct does not satisfy the elements of a crime. It is dangerous to suggest that any time a person's conduct offends the sensibilities of three judges or society at large, the government is privileged to incarcerate him. And it strains credulity to suggest that the United States Congress intended a statute to be construed as such.

The purpose of § 2513 is to limit compensation for unjust imprisonment to those who are truly innocent and to estopp those who elect not to avoid prosecution, by their actions or omissions, from relief. In light of the error of law committed by the district court in interpreting § 2513, I would reverse and remand with instructions to grant the certificate of innocence. Thus, I respectfully dissent.